OPINION OF THE COURT
WEIS, Circuit Judge.
In this appeal we determine that the bankruptcy judge’s ruling — that two separate agreements existed between a contractor and owner — was a matter of contract construction subject to plenary review. Although the district court used the clearly erroneous test, the error is not reversible because under either standard the result here is the same. We also conclude that the bankruptcy judge did not err in ruling that a surety’s right of equitable subrogation does not include the right to use profits from a post-bankruptcy contract to offset losses on pre-bankruptcy jobs. Accordingly, we will affirm.
In two consolidated adversary proceedings, the bankruptcy judge determined that liens of a surety should be avoided and denied it priority. The district court on appeal affirmed the orders of the bankruptcy judge.
Ram Construction Company filed for reorganization under Chapter 11 of the Bankruptcy Code on January 21, 1983. At that time, among other construction jobs, Ram was engaged in the removal of a landslide on Saw Mill Run Boulevard in Pittsburgh, Pennsylvania (Slide I), pursuant to a contract with the City dated December 8, 1982. As it had for other projects Ram was performing for the City, American States furnished a performance bond, as well as a labor and material bond, for the Slide I contract.
On February 16, 1983, about three weeks after the filing of the petition, a large rock slide occurred at the project site on the Boulevard (Slide II). There were two fatalities, and the road was closed, causing severe traffic congestion. The City was anxious to remove all debris from the roadway, to stabilize the hillside, and to reopen the Boulevard promptly. The Director of Public Works requested a proposal from Ram to undertake the work.
On February 21, 1983, Ram responded to the City by a letter agreeing to clear the road, but at substantially increased unit prices on all categories of earth and rock removal. Part of the increase was the result of the City’s insistence that the work proceed 24 hours a day, seven days per week until completion. To facilitate the work the road would remain closed for the duration of the project, a change from the Slide I contract under which traffic had to be maintained.
The Director of Public Works then asked City Council for “Authorization and Approval for Extra Work on the Saw Mill Run Boulevard rock slide.” After receiving that approval, the Department of Public Works issued an “Authorization for Additional Work,” utilizing the City Controller’s number for the original contract. A new written contract between the City and Ram was not prepared nor were new surety bonds executed.
Under the provisions of the Slide I contract, the City could have required Ram to perform “additional” work at the same unit prices, unless the amount of added work exceeded twenty-five percent of the original contract. The bankruptcy judge found that proviso inapplicable to the situation presented here because of the substantial increase in work required by the second slide.
*1052 American States presented evidence that it had suffered losses on other contracts that Ram had performed for the City, e.g., the “sewer job,” and that a profit was expected on Slide II. With these facts established, the surety contended that it was entitled to offset its earlier losses against the profits earned on Slide II.
The bankruptcy judge concluded that new contract rights and accounts had been created because the amount of work as well as the unit prices were greatly increased and the around the clock working conditions were significantly different from the original undertaking. That the City, for its convenience and for purposes of internal administration, labeled the project as “additional work” was not dispositive of whether there were two contracts or one. Consequently, the subrogation interest of American States, created by payments made in connection with pre-bankruptcy contracts, did not carry through to the Slide II project begun after the filing of the petition.
The district court affirmed the bankruptcy judge’s finding that two separate contracts had been executed and stated, “the factual finding of the bankruptcy court was not clearly erroneous; the court correctly construed the intent of the parties in determining the existence of distinct contracts.”
In this court, American States contends that the district court erred in applying the clearly erroneous standard to review the bankruptcy judge’s conclusion that there were two separate contracts, and that both forums erred in denying setoff rights. Ram argues that because the Slide II agreement was post-petition, there was no right of setoff against pre-petition obligations to which the surety’s subrogation rights could apply.
I
We turn first to the surety’s contention that the district court applied an inappropriate standard of review.
The distinction between issues of fact and law in contract disputes is not always sharply defined. When the controversy is over “historical” or “narrative” facts, the clearly erroneous rule is appropriate. For example, in this case, the price agreed on, the amount of work to be performed, and the terms of performance are narrative facts. As to those matters, the surety admits “there is little, if any, dispute as to the facts of this case, and American States does not contend that the factual findings are clearly erroneous, but many of the legal conclusions drawn from these findings are in error.”
When the question is one of contract interpretation, the difference between factual and legal conclusions is often confused with the assignment of functions between court and jury. When the agreement is in writing, ambiguous terms are interpreted by the jury, unambiguous ones by the court. Although this latter function is sometimes said to be a legal one, see Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co., 610 F.2d 1174, 1178 (3d Cir.1979), commentators differ.
Some authorities maintain that all questions of contract interpretation are factual matters, some of which are entrusted to the jury in ordinary civil litigation (ambiguous writings), and others which are for resolution by the judge (unambiguous terms). See Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA), 473 Pa. 576, 592, 375 A.2d 1267, 1275 (1977); RESTATEMENT (SECOND) OF CONTRACTS § 212 comment d (1981); 3 CORBIN ON CONTRACTS § 554 (1960); 4 WILLISTON ON CONTRACTS § 616 at 648-49, 660-63 (3d ed. 1961). This distribution of functions rests on outdated common law policy considerations, such as jury illiteracy and lack of respect for writings, as well as such continuing concerns as a judicial desire for uniformity. Meyers v. Selznick Co., Inc., 373 F.2d 218, 222 (2d Cir.1966); RESTATEMENT OF CONTRACTS 2d § 212; 4 WILLISTON ON CONTRACTS § 616.
*1053 In instances of contract interpretation, therefore, assignment to judge or jury does not of itself determine the standard of review to be applied on appeal. Interpretation by a trial court of a factual matter is reviewable on a clearly erroneous basis, rather than as a plenary one.
Sometimes there is, however, a mixed question of law and fact in which the legal operation of words is intertwined with their interpretation. When that occurs, the reviewing court should separate the issue into its respective parts, applying the clearly erroneous test to the factual component, the plenary standard to the legal. See Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98 (3d Cir.1982). Cf. Pullman Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).
When the question is one of “construction” as distinguished from “interpretation” of the contract, the issue is one of law. Professor Corbin’s definition of construction starts with interpretation but does not end there. Construction of the contract determines its legal operation— “its effect upon the action of courts and administrative officials.... When a court gives a construction to the contract as that is affected by events subsequent to its making and not foreseen by the parties, it is departing very far from mere interpretation ....” 3 CORBIN ON CONTRACTS § 534, at 9. In determining the legal effect an agreement will have on an event the parties did not foresee, the process is construction, not interpretation. Id. at 12.
“Construction, which may be usefully distinguished from interpretation, is a process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation.” Patterson, The Interpretation and Construction of Contracts, 64 COLUM.L.REV. 833, 835 (1964). When construction of a contract is the issue before an appellate court, the question is one of law and freely reviewable.
That an agreement is not committed to a single writing does not change the standard of review. When the interpretation of oral contracts or partly oral, partly written, contracts is before an appellate court, special deference is due the fact-finder’s ability to make credibility assessments. Meyers v. Selznick Company, Inc., 373 F.2d 218 (2d Cir.1966). However, just as with a written agreement, construction of the legal effect of an oral contract involves a determination of law subject to plenary review on appeal.
Against this background, it may be seen that the decision that two separate agreements for slide removal existed was one of contract construction, not interpretation. As the surety states and the record confirms, there are no differences between the parties on the material terms of the Slide II agreement. The amount and type of work, compensation, time and method of carrying out the work, and other details are not contested. No question of interpretation is presented, only the construction of the agreement; that is whether Slide II is to be considered legally part of the December 8, 1982 contract or as a separate agreement.
It follows that the district court erred when it limited itself to the clearly erroneous standard of review rather than the appropriate plenary one.[1] This error, however, does not require that the case be remanded. As we pointed out in Universal Minerals v. C.A. Hughes & Co., we are in as good a position as the district court to review the bankruptcy judge’s decision, but in so doing we will use the standard that should have been applied. 669 F.2d at 102.
II
Although it is not a foregone conclusion that the Slide II agreement was *1054 not simply an extension of the Slide I contract, we cannot say that the bankruptcy judge erred in this holding. We have reviewed the record carefully and are impressed by the fact that the second slide radically changed the conditions governing performance. The urgency which had not existed before, the continuing risk to the public safety, and the necessity for premium labor payments because of overtime and holiday work were not factors in the original contract.
The Slide II agreement differed substantially in cost, working conditions, and scope of the project. It is also significant, as found by the bankruptcy judge, that the work Ram performed on Slide II was not compelled by the City under the terms of the Slide I contract but resulted from a new proposal by Ram. A review of the record supports this finding and demonstrates that the work involved in the cleanup of Slide II went well beyond • anything the parties had contemplated in the Slide I contract.
We agree with the bankruptcy judge that the labels the City used in reaching an agreement with Ram are not dispositive of the legal issue confronting us. It is obvious that City officials are required to utilize a special terminology to comply with ordinances and established departmental directives. Those internal semantic demands, however, cannot mask the essential attributes of the Slide II arrangement the City made with Ram.
We conclude, therefore, that the bankruptcy judge did not err in holding that the Slide II arrangement created separate rights from those arising under the Slide I contract.[2]
Ill
The surety’s right to setoff its losses on the “sewer job” and other projects Ram performed for the City against the anticipated profits from Slide II rests on the equitable right of subrogation. In Jacobs v. Northeastern Corporation, 416 Pa. 417, 206 A.2d 49 (1965), the Pennsylvania Supreme Court defined the subrogation rights of construction contract sureties consistently with the United States Supreme Court’s opinion in Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). As Justice Roberts wrote for the state court, upon payment of claims of labor and materialmen, the surety is entitled to assert the benefits of subrogation against the sum retained by the public agency that contracted for the work.
The Jacobs opinion pointed out that labor and materialmen engaged in public construction are by statute a specially protected group. Their claims must be satisfied before the contractor and his general creditors are entitled to the funds. Having succeeded to the claims of labor and materialmen, a paying surety has superior rights over general creditors or the contractor’s trustee in bankruptcy.
This result follows because the funds in the hands of the owner are not property of the bankrupt estate until the claims of the labor and materialmen or the surety have been satisfied. See Pearlman v. Reliance Ins. Co.; Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896). The Pennsylvania Supreme Court also held that the surety’s equitable right of subrogation is not a “security interest” under the Uniform Commercial Code because the right does not depend on a grant in the contract but is created by law to avoid injustice. Jacobs, 416 Pa. at 427, 206 A.2d at 54.
In the case at hand, the bankruptcy judge, relying on section 552 of the Bankruptcy Code[3], held that American *1055 States had no pre-petition security interest because the Slide II contract was created after the bankruptcy began. We agree with that conclusion, but not with the rationale describing the surety’s subrogation right as a “security interest.” See Jacobs. As noted earlier, funds not yet expended by the municipality on a construction contract are not subject to a security interest until after the surety’s claim has been satisfied. See In Re Dutcher Construction Corp., 378 F.2d 866 (2d Cir.1967).
The subrogation right is an expansive one, and when the surety has paid claims, it succeeds not only to the interests of the labor and materialmen but to those of the municipality as well. Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Western Casualty & Surety Co. v. Brooks, 362 F.2d 486 (4th Cir.1966). Following that reasoning, American States contends that it stands in the shoes of the City as to the losses incurred in paying labor and material claims on such projects as the “sewer job.” Accordingly, the argument continues, the surety is entitled — as it maintains the City would be — to setoff the losses on the “sewer job” and other jobs against the “profits” on the Slide II contract.
This theory was rejected in Western Casualty & Surety Co. v. Brooks, on the ground that the right of subrogation extends only to the particular project on which the surety had made payments. The Court of Appeals held that the funds retained on each project were separate and distinct. Consequently, any obligation of the state to reimburse labor and material-men was limited to the funds retained on the particular project from which their claims arose.
Although we find no reason to differ with the Brooks decision, there is another reason why American States cannot prevail here. Because Slide II was a separate contract entered into after the filing of the petition in bankruptcy, the City would have no right to set off claims under prepetition contracts against profits created by a post-petition agreement. Cooper-Jarrett, Inc. v. Central Transport, Inc., 726 F.2d 93 (3d Cir.1984); see also United States v. Norton, 717 F.2d 767 (3d Cir.1983). Since the City could not offset a loss on other jobs against the proceeds of Slide II, neither can American States. “It is elementary that one cannot acquire by subrogation” from another, rights which that person did not have. United States v. Munsey Trust, Co., 332 U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947).
We conclude, therefore, that the bankruptcy judge correctly denied the surety’s request to set off its losses against excess funds on the Slide II project. Accordingly, the judgment of the district court will be affirmed.

. Because we find that the clearly erroneous test was not proper, we have no occasion to pass on the surety’s contention that use of that standard of review in bankruptcy appeals is unconstitutional. See 1616 Remnic Limited Partnership v. Atchison and Keller Co., 704 F.2d 1313 (4th Cir.1983). Cf. In Re Morrissey, 717 F.2d 100 (3d Cir.1983). See also Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

. Although there may be some inconsistency between the bankruptcy judge's holding on this point and his later ruling that the surety bond was applicable to Slide II, we do not consider that issue because Ram did not cross-appeal from the order of the bankruptcy judge.

. 11 U.S.C. § 552(b) (1982) reads in part: "if the debtor and a secured party enter into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of *1055 the case and to the proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law.”