Jacobs *v.* Northeastern Corporation, Appellant.

418

Argued March 20, 1964. Before Bell, C. J., Mus-
manno, Jones, Cohen, Eagen, O'Brien and Roberts,
JJ.

*A. Richard Nernberg,* with him *Bernard Goodman,*
and *McCrady & Kreimer,* for appellant.

*Howard K. Hilner,* for appellee.

*Carl A. Eck,* with him *J. Michael Doherty,* and
*Meyer, Darragh, Buckler, Bebenek & Eck,* for appel-
lee.

Opinion by Mr. Justice Roberts, January 12, 1965:
On November 11, 1961, Northeastern Corporation
entered into a contract with the General State Author-

ity for the construction of a state building. The contract called for a bond by Northeastern, conditioned upon the faithful performance of the contract and the payment of labor, material and equipment rental claims. On November 20, 1961, Northeastern also entered into a contract with the Secretary of Highways for the construction of certain state roads. This contract, too, called for a performance bond and an additional bond for the prompt payment of labor and material claims. Travelers Indemnity Company was surety on the bond for the building contract and Great American Insurance Company was surety on the bonds for the highway construction contract.

Northeastern defaulted in payment of certain labor and materialmen on each project and the sureties made payment in compliance with the bonds. On the petition of James C. Jacobs, a shareholder of Northeastern, that corporation was placed in receivership.

Final payment under both construction contracts is due and owing, but the amounts due on each are less than the amounts paid to labor and materialmen by the sureties. Each surety petitioned the court below for distribution to it of the moneys due on the respective contracts. Northeastern's receiver resisted the petitions and counterclaimed for the retained funds contending that the sureties are entitled to only their pro rata share as general creditors, not to the entire amounts as successors to the rights of the contractor.

The court below granted the petitions of the surety companies. This appeal followed from the dismissal of the exceptions filed by the receiver. After careful consideration, we are convinced that the court below correctly determined the issues.

## I

The right of the sureties to the funds rests upon the application of the doctrine of equitable subrogation. It is clear that our rule has been that the right of a

surety on a public construction bond to be subrogated to the right to the moneys withheld by the Commonwealth must be based on the existence of an obligation of the contractor contained in the construction contract to pay labor and materialmen. *DuBois v. United States Fidelity & Guar. Co.,* 341 Pa. 85, 18 A. 2d 802 (1941); *Sundheim v. Philadelphia School Dist.,* 311 Pa. 90, 166 Atl. 365 (1933).; *City of Philadelphia v. Nat'l Surety Corp.,* 140 F. 2d 805 (3d Cir. 1944). The construction contracts in the instant case expressly contain that specific obligation.

### A.

In part, the construction contract with the General State Authority explicitly recites: "WHEREAS, The Contractor has given his bonds to The Authority with sufficient surety in the sum determined upon by The Authority conditioned respectively for the faithful performance of the terms of this contract, the payment of claims for labor and material . . . ." Paragraph Nine of this contract reads: "The Contract Bond given by the Contractor conditioned upon the faithful performance of the Contract; the payment of labor, material and equipment rental claims . . . is attached hereto and made part hereof." Paragraph Thirteen adds: "Any person or corporation furnishing labor or material or actually renting . . . equipment to the Contractor or any Sub-contractor in connection with performance of this contract shall have a right of action to recover the cost thereof from the Contractor and the surety on the bond given to secure the payment for such labor, material or equipment rental as though such person or corporation had been named as obligee in such bond . . . ."

The pertinent provision of the bond referred to in the construction contract provides: "[I]f the above

bounden Principal shall and will promptly pay or cause to be paid all sums of money which may be due any person, co-partnership, association or corporation for all material furnished, labor supplied, or equipment actually rented (but not sold) in the prosecution of the work, whether or not the said material or labor enter into and become component parts of the work or improvement contemplated, than [sic] this part of this obligation shall be void; otherwise it shall be and remain in full force and effect."

This contract with the General State Authority, therefore, contains the specific obligation of the contractor to pay labor and materialmen. The obligation is created as a condition of the bond, and the bond is expressly made a part of the construction contract. Moreover, this particular contract gives unpaid labor and materialmen a right to recover from the principal and from the surety on the bond. A contract which explicitly grants such a right of action necessarily creates and imposes upon the contractor the obligation to pay for labor and material.

## B.

The construction contract with the Secretary of Highways provides, inter alia: "2. The contractor further covenants and agrees that all of said work and labor shall be done and performed in the best and most workmanlike manner and that prompt payment will be made in full for labor and materials used in the work . . . .

"8. The bond given by the contractor . . . to secure a proper compliance with the terms and provisions of this contract and as well as the Additional Bond . . . for the prompt payment in full for labor and material are hereto attached and made a part hereof."

The relevant provision of the additional bond for labor and material reads: "Now, THEREFORE, The condition of this obligation is such that if the above bounden principal shall and will promptly pay or cause to be paid in full all sums of money which may be due any person, copartnership, association, or corporation for all material furnished and labor supplied or performed in the prosecution of the work, whether or not the said material or labor enter into and become component parts of the work or improvement contemplated, and for rental of equipment used and services rendered by public utilities in, or in connection with, the prosecution of such work, then this obligation to be void, otherwise to remain in full force and effect."

It is manifestly clear that paragraph 2, above, alone or in conjunction with paragraph 8 and the bond, creates an express undertaking upon the part of the contractor to pay labor and materialmen under the terms of the construction contract itself.

## II

The practical and legal effect of the language in both contracts is identical with the language of the contract in *Lancaster County Nat'l Bank's Appeal,* 304 Pa. 437, 155 Atl. 859 (1931). In that case, the construction contract provided that the contractor "shall not assign . . . any right to any moneys to be paid him hereunder . . . without the consent in writing of the Secretary of Highways," and that "the Secretary will withhold the payment of any semi-final or final estimate, pending the receipt of the 'Application for Release of Bond,'" which application (the required form being attached) further stated it would not be granted until "all claims for labor and materials [incurred in the performance of the contract] have been satisfac-

torily settled."[1] This Court there concluded that the rights of the surety were superior to those of a bank to whom the contractor assigned the balance of payments due on the construction contract.

In the instant case, both the General State Authority and the Department of Highways had an implied right to withhold moneys, regardless of any express contractual provision to that effect, if they determined that there were unsatisfied claims for labor and material. Payment by the contractor of such claims being a condition in both construction contracts, the governmental agencies had the right to withhold funds, if there had been a breach of the condition, in order to protect the labor and material claimants under the construction contracts. The rule announced in *Lancaster County Nat'l Bank's Appeal,* supra, is applicable and binding here.

## III

Moreover, the time is appropriate to reconsider our earlier decisions in this area and to review the significance of the applicable statutes governing public work contracts as they affect the subrogation rights at issue. Contrary to the import of *Sundheim* and *DuBois,* the federal rule, see *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S. Ct. 232 (1962), and the rule prevailing in most jurisdictions, see 43 Am. Jur. *Public Works & Contracts* §197 (1942), is that the surety, upon payment of claims of labor and materialmen, is entitled

---

[1] The contract or performance bond, which is also a part of the construction contract with the Highway Department in this case, contains the identical right of the Secretary to withhold payment pending receipt of an application for release of final payments which includes evidence that labor and material claims have been paid.

to assert the benefits of subrogation against the funds withheld by the public agency.[2]

The bond for the payment of labor and material claims on the building contract is required by the General State Authority Act of 1949[3] and the bond for the payment of labor and materialmen on the highway contract is required by the State Highway Law.[4] The presently relevant provisions of these acts are substantially identical to the corresponding provisions in the Miller Act[5] (earlier known as the Materialman's Act) which governs federal public works.

*Martin v. Nat'l Surety Co.*, 300 U.S. 588, 57 S. Ct. 531 (1937), involved a situation similar to the one before us, but the case was decided on a much narrower basis. The Supreme Court held that labor and material claimants had an equitable lien on a fund as a result of an assignment in the contract between the primary contractor and the surety. However, Mr. Justice CARDOZO made the following observation: "[W]e have assumed that the failure to pay materialmen was a default of such a nature as to impose a duty on the contractor to turn over the payments to the surety upon appropriate demand. There is argument to the contrary. According to that argument the moneys were to be assigned in the event of default in the performance of the contract between the contractor and the Government, and not upon the failure to pay persons other than the Government who had claims against the

---

[2] The federal rule is approvingly discussed in Note, Reconsideration of Subrogative Rights of the Miller Act Payment Bond Surety, 71 Yale L.J. 1274 (1962).

[3] Act of March 31, 1949, P. L. 372, §11, as amended, 71 P.S. §1707.11.

[4] Act of June 1, 1945, P. L. 1242, §404, as amended, 36 P.S. §670-404.

[5] Act of August 24, 1935, c.642, §1, 49 Stat. 793, 40 U.S.C. §270a.

contractor for materials or labor. But the statute directs that a bond for the prompt payment of materialmen and laborers shall be executed by the contractor before the commencement of the work. Not only that, but the contract with the Government, which was drawn in the standard form, is a confirmation and adoption of the statutory duty. The terms of the bond are read into the contract, and there is default under the contract when there is default under the bond." Id. at 597-98, 57 S. Ct. at 535.

Recently in *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S. Ct. 232 (1962), the Supreme Court of the United States noted it was arriving at the same conclusion reached in *Martin,* but, in doing so, it did not limit itself to the narrow basis upon which that prior decision was rendered. In *Pearlman* the dispute was between the trustee in bankruptcy of a government contractor and the payment bond surety. Under the particular contract in question, the government withheld in excess of $87,000 which would have been due the contractor had he paid labor and material claimants. In sustaining the surety's right to this fund and in concluding that the fund was in no way an asset of the bankrupt estate, the Supreme Court held that: (1) the government had the right to use the retained fund to pay labor and material claims; (2) labor and material claimants had a right to be paid out of the fund; (3) the contractor would have been entitled to the fund had he paid labor and materialmen; and (4) the surety, having paid them, became subrogated to the fund.

The Supreme Court further observed that: "Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise such as the surety here had. And probably there are few doctrines better established than that a surety who pays the debt of an-

other is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country [is] generally known as the right of subrogation . . . ." (Footnotes omitted.) 371 U.S. at 136-37, 83 S. Ct. at 235.

The Supreme Court also quoted from *Memphis & Little Rock R.R. v. Dow,* 120 U.S. 287, 301-02, 7 S. Ct. 482, 489 (1887) : "The right of subrogation is not founded in contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties."

Even if we were able to accept appellant's view that the contracts here in question did not create an obligation in Northeastern to pay labor and materialmen, the surety companies should still prevail. The doctrine of subrogation is not founded upon contract, and, under these circumstances, is equally generated by the contractor's compliance with the statutory obligations to provide the bonds in question.

Labor and materialmen involved in public construction are a group specially protected by statute as well as by these particular contracts. Payment to them is secured by the bond of the contractor's surety. The funds available for the protection and payment of these claims are separate and apart from the relationship between the contractor and his general creditors. This is so irrespective of whether there exists a surety bond for payment. The execution of the surety bond for this special but well known purpose in no way involved or prejudiced the general creditors or the receiver.

The sum retained by the Commonwealth was an added mechanism for achieving performance, as well as providing a further resource for paying labor and materialmen, especially since that sum is less than the total amount due those claimants. Had the surety not paid the labor and materialmen, the funds held by the

Commonwealth agencies would not have been available to the general creditors. Since the sureties stand in the places of those whose claims they have paid, as persuasively pointed out in *Pearlman*, the funds must be paid to the sureties, just as the funds would have gone, in the absence of a bond, to the labor and materialmen rather than to the general creditors. See *Prairie State Bank v. United States*, 164 U.S. 227, 239, 17 S. Ct. 142, 147 (1896), quoted in *Pearlman*.

## IV

Appellant poses an additional problem in his effort to preclude the surety companies from retaining the proceeds in issue. Appellant urges that the sureties did not file financing statements, as he contends is required by the Uniform Commercial Code. Accordingly, his conclusion is that appellees hold an unperfected security interest which may not prevail over the general creditors.

Article 9 of the Uniform Commercial Code[6] deals with secured interests. It is clear that the sureties in the case before us filed no financing statements as defined in the Code.[7] The issue simply is: Were they required to do so? We hold that they were not.[8]

---

[6] Act of April 6, 1953, P. L. 3, §§9-101 to 9-507, as amended, 12A P.S. §§9-101 to 9-507 (Supp. 1963).

[7] Sections 9-401 to 9-404, 12A P.S. §§9-401 to 9-404 (Supp. 1963).

[8] While *United States v. Fleetwood & Co.*, 165 F. Supp. 723 (W.D. Pa. 1958), might seem to indicate a different result, it should, at least, be noted that only a performance bond was involved in that controversy and not a bond covering the statutory protection afforded labor and materialmen, as we have here. In addition, the surety sought to prevail on the basis of an assignment contained in the application for the bond. However, we need not now determine whether or not we would reach a result in accord with *Fleetwood* were the facts of that case before us.

None of the purposes or objectives of the Code's filing requirements would be served by holding that the subrogation to the contract balance now due is an assertion of a "security interest" and therefore subject to the filing provisions of Article 9. The contract balance withheld would never have become due and payable to Northeastern (or its receiver or creditors) as long as Northeastern defaulted on its obligation to pay labor and materialmen. Payment of the retained balance became due and available *only* upon performance by the sureties of Northeastern's obligations. It is clear that all labor and material claims must be fully discharged before there is entitlement to the full contract payment. In all respects, the result so far as Northeastern and its creditors are concerned is precisely the same whether the sureties satisfy the unpaid laborers and materialmen, or whether the Commonwealth directly pays the claimants out of the retained funds. Surely, the creditors of Northeastern are not adversely affected because the sureties were called upon to, and did, perform their undertaking to pay labor and material claims.

It seems exceedingly clear that, in the present suretyship situation, filing is not needed to prevent deceiving or misleading the creditors about the state of the contractor's available assets. Furthermore, filing in this instance could in no conceivable way be beneficial to or protective of the general creditors. They are completely unaffected by the filing or absence of filing. Since the funds here at issue represent an asset never available to general creditors, there is no reason for requiring the filing of a financing statement by the sureties. As a legal and practical matter, no creditor could or did advance credit on the basis of the funds withheld by the Commonwealth for payment to labor and materialmen. Furthermore, creditors are bound to know of the substantive law requiring the filing of

bonds and the possible claims of sureties in the event of defaults by contractors. *Lancaster County Nat'l Bank's Appeal,* 304 Pa. 437, 442-43, 155 Atl. 859, 861 (1931).

Of basic importance is the general rule of Section 9-102(2)[9] that Article 9 "applies to security interests *created by contract.*" (Emphasis supplied.) Rights of subrogation, although growing out of a contractual setting and ofttimes articulated by the contract, do not depend for their existence on a grant in the contract, but are created by law to avoid injustice. Therefore, subrogation rights are not "security interests" within the meaning of Article 9. The sureties' rights of subrogation, having been created by operation of law, are not the usual type of consensual security interests contemplated by the Code.[10]

We are thus convinced that the Code does not preclude recovery in this case.

Judgment of the court below affirmed.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

I agree with the views expressed in the majority opinion except in one important respect. In the case at bar, the sureties did not file financing statements as defined in the Uniform Commercial Code (Act of April 6, 1953, P. L. 3, §§9-401 to 9-404, 12A P.S. §§9-401 to 9-404) and the majority of this Court now hold that such filing was not required. My reading

———

[9] 12A P.S. §9-102(2) (Supp. 1963).

[10] We note that the Comment to §9-102 states that "the purpose of . . . [§9-102] is to bring all security interests in personal property under this Article, as well as sales of accounts, contract rights and chattel paper whether intended for security or not." The Comment adds that the principal test in determining whether a transaction comes under Article 9 is: "Is the transaction intended to have effect as security?" 12A P.S. p. 335. Surely, the transaction in question in this case was not intended to have that effect.

430

of the language and scope of the Code convinces me that it is of such breadth as to require the filing by sureties such as those in the instant situation of such financing statements[1] and I find nothing in the Code which would exempt, specifically or otherwise, the instant sureties from filing such statements.

Accordingly, I dissent and for this reason would reverse the judgment entered in the court below.

Mr. Justice Cohen joins in this opinion.

---

[1] See: *United States v. Fleetwood & Co.*, 165 F. Supp. 723 (W.D. Pa. 1958).