The **NATIONAL SHAWMUT BANK OF BOSTON**, Plaintiff,

v.

**NEW AMSTERDAM CASUALTY COMPANY**, Inc., Defendant.

**Civ. A. No. 64–937.**

United States District Court
D. Massachusetts.

Sept. 27, 1968.

---

W. Bradley Ryan, Guterman, Horvitz & Rubin, Boston, Mass., for plaintiff.

Samuel H. Cohen, Boston, Mass., for defendant.

## OPINION

GARRITY, District Judge.

This is a civil action brought by plaintiff National Shawmut Bank of Boston (Bank) against defendant New Amsterdam Casualty Company, Inc. (Surety) to recover a fund of $44,202.05 held in escrow by the latter under an agreement between the parties.

The events leading to the controversy were largely undisputed and stipulated prior to a non-jury trial.[1] In 1962 An-

---

1. The trial was devoted chiefly to determining whether the proceeds of the Bank's loans were used by the Contractor in performing the three contracts, or were diverted. This question has become irrelevant under the view of the applicable law taken by the court.

derson Brothers, Inc. (Contractor) entered into three contracts with the United States to renovate certain facilities at the Dow and Otis Air Force Bases located, respectively, in Maine and Massachusetts. Under the Miller Act, 40 U.S.C. §§ 270a–270b, the Contractor was required to furnish payment and performance bonds, which it did. The contracts of suretyship were made with the defendant and contained a clause whereby the Contractor assigned to the Surety "all retained percentages, deferred payments, earned moneys and all funds and properties whatever that may be due or become due under said contract * *."

Subsequently the Bank filed a "financing statement" pursuant to Mass.Gen. Laws, ch. 106 (the Uniform Commercial Code, hereafter cited merely as U.C.C.), and obtained assignments of the Contractor's "right, title and interest in and to all moneys due and which shall hereafter become due" under the three contracts. The Bank sent notice of the assignments to the Contracting and the Finance Officers at the two air bases, pursuant to the Assignment of Claims Act, 31 U.S.C. § 203, but did not give written notice to the Surety. Between October 19, 1962 and January 9, 1963, the Bank made a series of loans to the Contractor totaling $63,260, of which $37,477.61 remains unpaid.

By June 1963 the Government had lawfully terminated all three contracts owing to default by the Contractor. At that time it held $44,202.05 which had been earned by but not yet paid to, the Contractor.[2] The Surety was called upon to complete the contracts, and did so. It thereupon claimed the sum held by the Government. The Bank also claimed, as assignee of the Contractor. On July 30, 1963 the Bank and the Surety agreed to the Government's releasing the fund

to the Surety, to be held in escrow by the latter, pending a determination of the dispute. By civil action the parties now seek such a determination from this court. Three basic issues of law are raised by the facts, as appears below.

### Assignment of Claims Act

 The Assignment of Claims Act, 31 U.S.C. § 203, provides that claims against the United States are generally non-assignable. There is, however, an exception for assignments to banks of contract rights to $1000 or more, provided:

"4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with * * * (b) the surety or sureties upon the bond or bonds, if any, in connection with such contract * * *."

The parties have stipulated that the Bank did not give written notice to the Surety, as the quoted language requires.[3] Does this omission automatically render the assignment void? It has been held by the Supreme Court that 31 U.S.C. § 203 does not have such an effect where the dispute is between private parties with no claim asserted against the United States, for the statute was enacted merely to protect the Government from embroilment with conflicting claimants. Segal v. Rochelle, 1966, 382 U.S. 375, 384, 86 S.Ct. 511, 15 L.Ed.2d 428.

 The question remains as to what effect the Bank's omission does have. There is apparently only one case on the point, New Amsterdam Cas. Co. v. Manufacturers and Traders Trust Co., 2 Cir., 1964, 330 F.2d 575. There it was held that the surety should have the

2. It also held a fund composed of 10% of each progress payment which, pursuant to an express term of the contract, had been withheld pending completion of the jobs; this fund is known in the trade as "retainage"; it has been paid to the defendant and plaintiff makes no claim to it.

3. There was some evidence that oral notice had been given, but on the view of the issue taken by this court, it is unnecessary to make such a finding, or determine the effect, if any, of such a fact.

opportunity at trial "to prove, if it can, that it was prejudiced by lack of notice." 330 F.2d at 576. Presumably the surety could recover damages from the bank to the extent that it was "prejudiced" by the latter's failure to perform its statutory duty to the surety.[4] In any event, in the instant case the Surety has made no effort toward the required demonstration of a causal link between its injury and the Bank's failure to give notice. This issue, therefore, need occupy us no further.

### Equitable Subrogation

Absent any statute to the contrary (an assumption examined later), a principal is placed by equity in the position of the payee, and is awarded the rights the payee possessed before satisfaction of the debt. Simpson, Suretyship § 47 (1950). This substitution has been termed an "assignment by operation of law." Restatement, Security § 141, comment a, (1941). Having failed to file any financing statement, the Surety relies on this right. But the Surety itself undertook to complete the projects; it did not merely pay the Government or the various original subcontractors. Therefore, there is no "payee" in the usual sense, to whose rights the Surety may be subrogated. However, it seems proper to view the Government, to which the bonds ran, as the "payee" and to regard payment as having been made to it "in kind."

The question next arises as to what the Government's rights to the earned but unpaid progress payments were, prior to its being satisfied by the Surety's performance. There is relatively little case law on the point, for the Government has no contractual right to withhold such an amount.[5] Most litigated cases have involved merely retain-

age. E. g., Pearlman v. Reliance Ins. Co., 1962, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190. In a relatively recent case, however, the Pennsylvania Supreme Court had occasion to consider the right of governmental agencies to withhold ordinary payments absent an express authorization to do so. Jacobs v. Northeastern Corp., 1965, 416 Pa. 417, 206 A.2d 49, 11 A.L.R.3d 1220. The court held that they "had an implied right to withhold monies, regardless of any express contractual provision to that effect, if they determined that there were unsatisfied claims for labor and material." 206 A.2d at 52. This court agrees. Here, then, is a right to which the Surety may claim subrogation, unless there is some further obstacle. The Bank suggests that there is, in the form of the U.C.C.

### Uniform Commercial Code

Has the doctrine of equitable subrogation survived the enactment of the U.C.C.? On this issue there appear to be but two cases in point. The earlier of them is United States for Use of Greer v. G. P. Fleetwood & Co., W.D.Pa., 1958, 165 F.Supp. 723, involving a surety's claim, as assignee of a contractor, to a fund held by the State and composed of earned but unpaid progress payments. The court did not mention the possibility that the surety was secured as a subrogee of the owner. It may be that the surety simply failed to raise the point, in which event the case merely illustrates a lapse in pleading. But the case is sometimes cited for having held impliedly that subrogation has not survived enactment of the U.C.C. Note, 65 Colum.L.Rev., 927, 931 (1965). A more recent decision on the point is Jacobs v. Northeastern Corp., supra. In this case a contractor had failed, leaving unpaid materialmen and laborers whose claims

---

4. Since there is no contract between bank and surety, and no question of restitution, presumably the action is one of tort, for breach of a statutory duty.

5. The reason for the withholding in this case remains obscure. The point was not covered in the stipulation of facts. At a

pretrial conference it was suggested that an administrative oversight may have been responsible. More probably there was an unavoidable interval between performance of the work and payment for it during which the Contractor's defaults arose.

sureties had discharged. In an action by the sureties against the contractor's receiver the U.C.C. was held inapplicable to the sureties' rights of subrogation; i. e., it was unnecessary for the sureties to have filed financing statements to preserve their potential rights.

■■ As appears from the opinion in the *Jacobs* case, the language of the U.C.C. is somewhat inconclusive on this question. U.C.C. § 9–102(2) sets forth the general rule that Article 9 "applies to security interests created by contract", whereas subrogation is a device of equity rather than a consensual creation. Furthermore, U.C.C. § 1–103 provides that the general principles of law and equity shall supplement the U.C.C. "unless displaced by the particular provisions of the Act." But it has been suggested that the equitable doctrine of subrogation should not continue after the U.C.C. has provided an "adequate remedy at law." Note, 65 Colum.L.Rev. 927, 933 (1965); Note, 69 Dick.L.Rev. 172, 178–80 (1965). However, the filing provisions of Article 9 do not seem to be a "remedy" within the meaning of that classic maxim, because they are actually preventative, not remedial. If the opportunity to file is a "remedy," then the jurisdiction of equity could be sharply curtailed, for there are few suits that could not be avoided by astute legal counseling at an earlier stage. At any rate, it seems that express language could and should be used to extinguish a right as venerable and well-known as that of subrogation. See Cushman, "The Surety's Right of Equitable Priority to Contract Balances in Relation to the U.C.C.," 39 Temp.L.Q. 239 (1966).

Because of the ambiguity of the U.C.C.'s language just noted, and because of the Surety's appeal to an equitable doctrine, it is necessary to determine what result is suggested by an examination of policy. The Pennsylvania Supreme Court, in the *Jacobs* case, offered the following consideration as the principal rationale of its opinion:

"None of the purposes or objectives of the Code's filing requirements would be served by holding that the subrogation to the contract balance now due is an assertion of a 'security interest' and therefore subject to the filing provisions of Article 9. The contract balance withheld would never have become due and payable to Northeastern (or its receiver or creditors) as long as Northeastern defaulted on its obligation to pay labor and materialmen. Payment of the retained balance became due and available *only* upon performance by the sureties of Northeastern's obligations. It is clear that all labor and material claims must be fully discharged before there is entitlement to the full contract payment. \* \* \*

"It seems exceedingly clear that in the present suretyship situation filing is not needed to prevent deceiving or misleading the creditors about the state of the contractor's available assets."

The view expressed in this quotation seems applicable by analogy to the case before us, even though the Bank here is a secured creditor, unlike the analogous claimant in the *Jacobs* case. It may be true [6] that the Government in the present case ought to have made the $44,202.05 payment to the Bank. On that assumption, prior to any default the Bank no doubt could have sued for the amount due. On this premise the Bank urges that equity regards as done that which ought to have been done, and therefore urges the court to treat the fund as if it had been disbursed at the proper time.

■ But the fact is that it was not, and shortly thereafter the Bank's right to the fund was vitiated by the Contractor's default. After the latter event a suit by the Bank against the United States for the $44,202.05 could have been

---

**6.** And it may not—so far as appears, as noted in n. 5, supra, the Contractor's defaults occurred while the usual reports, authorizations and vouchers were being processed administratively.

met with a counterclaim by the Government for $97,178.92, the cost of completing the contract, if the Surety had not performed on its bond. Rule 13(a), Fed. R.Civ.P., Jacobs v. Northeastern Corp., supra. It is this fact situation to which equity must look, not one which may have existed at an earlier date. And doing so clearly discloses that it was only the Surety's performance which saved the fund from the Government's claim. In this light, it does not seem unfair for the Surety now to claim subrogation to that claim. The Bank contends that the effectiveness of its security interest in the earned but unpaid fund should not depend on the "fortuity" of nonpayment by the Government. But here the chance occurrence does not yield an inequitable result, for the Contractor (and thus the Bank, its assignee) ultimately proved unentitled to the payments. Under these circumstances, the court does not shrink from allowing the Surety to prevail by what might be termed a fortuity.

Accordingly the complaint is dismissed and the defendant Surety is awarded its costs.