**In the Matter of J. V. GLEASON CO., Inc., Bankrupt.**

**J. J. MICKELSON, Trustee in Bankruptcy for J. V. Gleason Co., Inc., Appellant,**

**v.**

**AETNA CASUALTY AND SURETY COMPANY, Appellee.**

**No. 71–1029.**

United States Court of Appeals, Eighth Circuit.

Dec. 17, 1971.

Hyman Edelman, Minneapolis, Minn., for appellant.

Mary Jeanne Coyne, Minneapolis, Minn., for appellee.

6. *Id.* at 426.

Before JOHNSEN, Senior Circuit Judge, GIBSON and LAY, Circuit Judges.

GIBSON, Circuit Judge.

The sole issue presented for review is whether a surety's equitable subrogation claim constitutes a "security interest" under the Minnesota Uniform Commercial Code, M.S.A. § 336.1–101 et seq., and is thus required to be filed in order to perfect as a lien against a trustee in bankruptcy.[1] The Referee in bankruptcy held it was not. The District Court affirmed. We affirm.

The facts are not in dispute. In 1967 and 1968 the J. V. Gleason Co., Inc., (the bankrupt) entered into five construction contracts with the State of Minnesota or one of its local governmental entities and gave both performance and payment bonds for each contract, with Aetna Casualty & Surety Co. as the surety. Each contract provided for progress payments based on the percentage of the work completed, subject to withholding a retained percentage pending completion. Gleason was unable to complete these contracts and Aetna as surety was called on to and did perform.

Gleason filed a petition for an arrangement proceeding on January 27, 1969, and was declared a bankrupt on April 22, 1969. This action between the trustee and Aetna, as surety, concerns the entitlement to the retained percentages earned by the bankrupt prior to default.

The Referee and District Court held that under the doctrine of subrogation an equitable lien was created at the time the surety completed performance on the contracts, and the lien related back in time to the making of the suretyship contract, thus giving the surety superior rights to the retained percentages.

Prior to the adoption of the Uniform Commercial Code the doctrine of equitable subrogation as respects a surety's right to be subrogated for loss incurred under the surety's contract was firmly established. Prairie State National Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); Henningsen v. United States Fidelity & Guaranty Company, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908).[2]

Before the advent of the Uniform Commercial Code many states made no provision for the filing of notice of equitable liens or of claims against future earnings such as might arise by way of operation of law through the equitable subrogation lien doctrine in surety cases. The Uniform Commercial Code provides that transactions involving a "security interest" shall be filed,[3] and this broad requirement could be viewed as including equitable claims and suretyship agreements.

---

1. The trustee by statute has the status of a lien creditor. (M.S.A. § 336.9–301).

2. For a period of time many courts thought that the decision in United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), had overruled Prairie State National Bank and Henningsen. This erroneous interpretation was laid to rest in Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), where the court affirmatively stated that, " * * * Munsey left the rule in Prairie State National Bank and Henningsen undisturbed." 371 U.S. at 141, 83 S.Ct. at 237.

3. Under M.S.A. 336.9–302(1), "A financing statement must be filed to perfect all security interests except the follow-

ing:" Then follows a list of exceptions not considered pertinent to this issue, although some doubt exists as to the applicability of exception 1(e), reading: "(e) an assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor." See Canter v. Schlager, 267 N.E.2d 492 (Mass.1971) where a court explicitly declined to rule on this exception, since a prior Massachusetts case of French Lumber Co., Inc. v. Commercial Realty & Finance Co., Inc., 346 Mass. 716, 195 N.E.2d 507, 510 (1964) expressly held, "No provision of the Code purports to affect the fundamental equitable doctrine of subrogation."

In this case Aetna paid the claims of laborers and materialmen, which were far in excess of the amounts retained during the performance period by the owner. It is conceded that the owner had the right to use the retained funds to complete the work and pay laborers and materialmen from the fund, that the laborers and materialmen had an equitable right to be paid out of these funds, and further that their claims were not required to be filed in order to be perfected.

The referee denied the claims of Aetna that were based upon the express assignment contained in each suretyship contract,[4] but allowed the claims based on equitable subrogation. The liens allowed by the referee were those resulting by operation of law for funds expended by the surety in paying off obligations that were a proper charge against the retained funds held by the owner. Thus where the surety's claim could rest on the principle of equitable subrogation it was held not to be a "security interest" under the Uniform Commercial Code and consequently need not be filed.

The trustee directs a two-pronged attack, contending (1) that the surety's claim against retained funds is a "contract right" under the Uniform Commercial Code, operating as an assignment of future earnings given to secure performance by the principal, and thus is a "security interest" required to be filed under the Code, and further that the surety's right of equitable subrogation on retained funds arises from and relates back to the original contract of surety, citing Prairie State National Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896), and (2) that the 1950 amendment of § 60 of the Bankruptcy Act, 11 U.S.C. § 96, abolishes equitable liens where available means of perfecting legal liens exists.

█ We first consider whether a surety claim arising under the doctrine of equitable subrogation is a "security interest" under the Uniform Commercial Code.

Section 1–103 of the Uniform Commercial Code, adopted as M.S.A. § 336.1–103, provides:

"Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

The Code is silent on the subject of subrogation and equitable liens created thereby; however, some authorities have hypothesized that a provision which was considered, but not included by the drafters,[5] indicates that they considered the equitable lien to be a security interest. This provision was rejected by the Editorial Board of the Code as being contrary to existing law and its failure to accept the provisions negates the trustee's claim that equitable subrogation rights constitute security interests. In fact this indicates an intentional recognition of and a desire to preserve the doctrine of equitable subrogation.[6]

4. There was no loss on one of the claims but Aetna had a right under each suretyship agreement for general advances. This claim was held nonenforceable because it was not filed. It is not in issue on this appeal.

5. The provision considered as § 9–312(7) provided:

"A security interest which secures an obligation to reimburse a surety * * * secondarily obligated to complete performance is subordinate to a later security interest given to a secured party who makes a new advance, incurs a new obligation, releases a perfected security interest, or gives other new value to enable the debtor to perform the obligation for which the earlier secured party is liable."

6. Recommendations of the Editorial Board for Changes in the Text and Comments

The scope of the application of Article 9 is contained in § 9–102. It provides: "(1) * *· * [T]his article applies * * * (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property * * * including * * * accounts or contract rights; * * *." The official comment which accompanies this section indicates that this section was intended to apply to all *consensual* security arrangements under the Code.[7] Obviously, the equitable lien, having been created by courts of equity, does not arise from the consent of the parties or by their intent, but by operation of law. Section 9–102(2) provides that the Article applies to "security interests created by contract." In the case of an equitable lien which arises because of the subrogation, the interest is not created by the contract but by law to avoid injustice. The Pennsylvania Supreme Court said:

"Rights of subrogation, although growing out of a contractual setting and ofttimes articulated by the contract, do not depend for their existence on a grant in the contract, but are created by law to avoid injustice. Therefore, subrogation rights are not 'security interests' within the meaning of Article 9." Jacobs v. Northeastern

Corp., 416 Pa. 417, 429, 206 A.2d 49, 55 (1965).

In the instant case, where the lien arose by operation of law, independent of any consensual agreement, it would seem clear that Article 9 dealing with consensual security interests would not be applicable. The trustee's position would have substance as to the contract of suretyship, absent an applicability of any statutory exceptions in the Code, if the surety's lien claim rests solely on the contract.

There is no reason to assume that the provisions of Article 9, are applicable to the suretyship situation. The surety's position is quite different than that of the commercial lender, who is obviously the primary target of Article 9.[8] The First Circuit appropriately pointed this out in National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843, 845 (1969):

"This unique accumulation of subrogation rights serves to induce a function that is neither ordinary insurance nor ordinary financing. * * * Neither is the business one of ordinary financing, for while the surety extends its credit to the owner * * *, as the ultimate guarantee that the job will be done, this is a credit that may either never have to

of the Uniform Commercial Code, Official Draft, Text and Comments Edition, pp. 24–25, April 30, 1953:

"The Surety Companies' representative convincingly took the position that subsection (7) as it stands is a complete reversal of the case law not only of the Supreme Court of the United States but also of the highest courts of most of the states. * * * (Citations omitted).

* * * * *

"Under the cited case law, the surety's rights come first as to the funds owing by the owner unless the surety has subordinated its right to the bank. Subsection (7) of the Code as written would reverse the situation and give the bank priority in all cases.

"Under existing case law, both the contractor and the bank are in a position to bargain with the surety which may or may not be willing to subordi-

nate its claim. Under subsection (7) as written in the Code the surety company would have nothing to bargain about."

7. The official comment states:

"The purpose of this Section is to bring all consensual security interests in personal property and fixtures, with the exception of certain types of transactions excluded by Sections 9–103 and 9–104, under this Article, * * *.

"1. Except for sales of accounts, contract rights and chattel paper, the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security?"

8. "The aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and greater certainty." Official Comment to § 9–101.

be drawn upon or, if it is drawn upon at all, will in all likelihood be overdrawn."

The trustee's heavy emphasis on the need for notice is fully answered by the Court in Jacobs v. Northeastern Corp., 416 Pa. 417, 206 A.2d 49, 54 (1965):

"None of the purposes or objectives of the Code's filing requirements would be served by holding that the subrogation to the contract balance now due is an assertion of a 'security interest' and therefore subject to the filing provisions of Article 9. The contract balance withheld would never have become due and payable * * * as long as Northeastern defaulted on its obligation to pay labor and materialmen. Payment of the retained balance became due and available *only* upon performance by the sureties of Northeastern's obligations. * * *.

\* \* \* \* \* \*

"It seems exceedingly clear that in the present suretyship situation filing is not needed to prevent deceiving or misleading the creditors about the state of the contractor's available assets. Furthermore, filing in this instance could in no conceivable way be beneficial to or protective of the general creditors. * * * [S]ince the funds here at issue represent an asset never available to general creditors, there is no reason for requiring the filing of a financing statement by the sureties."

It should be noted that one of the express purposes and policies underlying the Code is "to make uniform the law among the various jurisdictions." § 1–102(2) (c). This purpose would be ill-served if we were to hold for the trustee. All of the still viable decisions hold that the doctrine of equitable subrogation in suretyship cases has not been affected by the adoption of the Code. Ja-

cobs v. Northeastern Corp., 416 Pa. 417, 429, 206 A.2d 49, 55 (1965); National Sur. Corp. v. State National Bank, 454 S.W.2d 354 (Ky.1970); Aetna Cas. & Sur. Co. v. Perrotta, 62 Misc.2d 252, 308 N.Y.S.2d 613 (1969); French Lumber Co., Inc. v. Commercial Realty & Finance Co., Inc., 346 Mass. 716, 195 N.E.2d 507 (1964); Canter v. Schlager, 267 N.E.2d 492 (Mass.1971); National Shawmut Bank of Boston v. New Amsterdam Cas. Co., Inc., 411 F.2d 843 (1st Cir. 1969) (applying Mass. law); American Fire & Cas. Co. v. First National City Bank of New York, 411 F.2d 755 (1st Cir. 1969) (Puerto Rico); Framingham Trust Co. v. Gould-National Batteries, Inc., 427 F.2d 856 (1st Cir. 1970) (applying Mass. law); Home Indemnity Co. v. United States, 433 F.2d 764, 193 Ct.Cl. 266 (1970) (applying Ill. law).

The cases cited by the trustee, United States for Use of Greer v. G. P. Fleetwood & Co., 165 F.Supp. 723 (W.D.Pa. 1958) (applying Pennsylvania law) and Hartford Accident & Indemnity Co. v. State Public School Building Authority, 26 Pa.Dist. & Co.R.2d 717 (1961), did not reach the issues before us. The *Fleetwood* case was decided on an unfiled express assignment and the issue of equitable subrogation was not raised; *Hartford* involved the issue of lien priorities. To whatever extent the decision in Maryland Casualty Co. v. Mullett, 295 F.Supp. 875 (W.D.Pa.1969), holding equitable subrogation not applicable to the surety's claim against funds held by a stakeholder, conflicts with this opinion, it does not appear to correctly state the law of Pennsylvania.[9]

However, aside from policy considerations, which basically lie with the legislative branch, a suretyship undertaking is not a true financing arrangement or security interest as those conceptual phrases are ordinarily and commonly used. There is no financing in the usual

---

9. The Pennsylvania Supreme Court in Jacobs v. Northeastern Corp., 416 Pa. 417, 206 A.2d 49, 54 (Pa.1965) held: "It is clear that the sureties in the case before us filed no financing state-

ments as defined in the Code. The issue simply is: Were they required to do so? We hold that they were not."

sense but rather a type of insurance running to the owner that insures the contractor's performance in case of default. No funds are advanced at the time of the suretyship contract. Regardless of the terms of the suretyship agreement, the equitable lien does not attach until the surety pays out funds in performance of the suretyship obligation and either completes the construction contract or satisfies existing liens. In this type of situation the general creditors of the bankrupt obligor are not discriminated against. There is no secret lien. The surety merely steps in the shoes of the owner and other lienholders to the extent of the surety's performance.

Suretyship and general financing arrangements are different conceptually and there is no valid reason to paint them with the same broad brush, nor is filing for the sake of filing a cogent reason for favoring the trustee and general creditors over a surety who has suffered the direct loss on performance. To introduce further complications of filing so-called financing arrangements, which are not in fact true financing arrangements, where no legitimate purpose is served is a waste of time and energy.

The law review articles[10] cited by the trustee to question the soundness of the cases discussed herein are not persuasive. First, although the suretyship arrangement is consensual, there is no reason to discard the doctrine of equitable subrogation. Second, a suretyship contract is neither a true financing arrangement nor is it a secret interest. Third, there are other provisions of the Uniform Commercial Code that may exempt suretyship contracts. These provisions have not been fully considered by either the courts or the commentators.

M.S.A. § 336.9–104(f) does not apply to "* * * a transfer of a contract right to an assignee who is also to do the performance under the contract." Under § 336.9–302(1) (e), "An assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor" are excepted. (Official comment is "This paragraph exempts from the filing requirement assignments of accounts or contract rights which are out of the ordinary course of financing.") Fourth, the author of Canter v. Schlager, 267 N.E.2d 492 (Mass.1971) (holding equitable subrogation in surety cases unaffected by the Code), Justice Robert Braucher, a former Harvard Law School Professor, has enjoyed a longer and deeper association with the Uniform Commercial Code than almost any other individual and is certainly as knowledgeable as any scholar in the United States on the development, enactment, and purposes of the Code. Fifth, admittedly before the Uniform Commercial Code, the doctrine of equitable subrogation in suretyship cases was firmly established and the question of whether this doctrine should be discarded is certainly a legislative one. The doctrine should not be abolished obliquely by labeling or mislabeling certain transactions as "security interests."

The trustee also contends a 1950 amendment to § 60 of the Bankruptcy Act, denies recognition of an equitable lien where available means of perfecting legal liens have not been utilized. Section 60(a) (6) [11 U.S.C. § 96(a) (6)] in pertinent part states:

"The recognition of equitable liens where available means of perfecting

10. Hoffman, Jacobs—Sureties Panacea or Narcosis? Article 9—The Uniform Commercial Code—Some Practical Aspects, 32 Ins.Counsel J. 387 (1967); Note, Bankruptcy—Conflicting Interests in Security—Status of Miller Act Surety—Pearlman v. Reliance Ins. Co., 4 B.C. Ind. & Com.L.Rev. 748 (1963); Note, Jacobs v. Northeastern Corp.: Surety's Dilemma—Subrogation Rights or Perfected Security Interest, 69 Dick.L.Rev. 172 (1965); Note, National Shawmut Bank: Another Step toward Confusion in Surety Law, 64 NW.U.L.Rev. 582 (1969); Recent Developments, Suretyship: Subrogation Under the Uniform Commercial Code, 65 Colum.L.Rev. 927 (1965).

legal liens have not been employed is declared to be contrary to the policy of this section."

It is then argued that since the Code would permit the filing of a financing statement in the form of a suretyship agreement, an adequate legal remedy has been provided and the equitable doctrine of subrogation should not be applicable. This contention overlooks the effect of Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), expressly recognizing and re-asserting the equitable subrogation doctrine in suretyship cases, and the fact that the purpose of the amendment noted sought to eliminate secret liens where the property in question remained in the hands of the debtor, and where there was no recordation or notice of the transaction for the benefit of third persons and the equitable lienor could perfect his claim and prevail over the trustee merely by acquiring physical possession of the property prior to the bankruptcy. The transfer of possession did not constitute a preference under the Act where the original agreement antedated the four months preference period because perfection of the claim "related back, to the original agreement", 3 Collier, Bankruptcy ¶ 60.50, (14 Ed.1969).

The type of equitable lien denied recognition by § 60(a) (6) of the Bankruptcy Act, 11 U.S.C. § 96(a) (6), is not related to a surety's right of subrogation. The bankrupt never had possession of the retained funds or a right of possession.[11] These funds were held by the owner for the benefit of the owner and lienholders who actually supplied labor or material. The surety also had no right to the retained funds until it paid off the liens of the materialmen and laborers and otherwise performed the contract. The subrogation right here is an equitable right inherent in the suretyship relation and is not an equitable lien subject to the provisions of § 60(a) of the Bankruptcy Act. Danais v. M. De Matteo Construction Co., 102 F.Supp. 874 (E.D.N.H.1952).

In Pearlman v. Reliance Insurance Co., *supra,* the Supreme Court in 1962, well after the passage of the 1950 amendment referred to above, pointed out the property interests in a fund which is not owned by the bankrupt at the time of the adjudication are not part of the bankrupt's estate, and pointedly held, "The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors." 371 U.S. at 135–136, 83 S. Ct. at 234.

The judgment is affirmed.

---

11. United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960), holds a contractor only has a property right in retained funds to the extent the funds exceed other claims for labor and material furnished for performance.