In re RAM CONSTRUCTION COMPANY, INC., Debtor.

EQUIBANK, Plaintiff,

v.

RAM CONSTRUCTION COMPANY, INC. and American States Insurance Company, Defendants.

AMERICAN STATES INSURANCE COMPANY, Plaintiff,

v.

RAM CONSTRUCTION COMPANY, INC. and Equibank, Defendants.

Bankruptcy No. 83–135.

Adv. Nos. 83–0268, 83–0466.

United States Bankruptcy Court, W.D. Pennsylvania.

April 15, 1983.

John B. Montgomery, Tucker, Arensberg, Very & Ferguson, Pittsburgh, Pa., for debtor.

Robert N. Hackett, Baskin & Sears, Pittsburgh, Pa., for Equibank.

Henry Gusky, Plowman & Spiegel, Pittsburgh, Pa., for American States.

Sidney Baker, Pittsburgh, Pa., for Creditors' Committee.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Bankruptcy Judge.

This dispute concerns the priority position between Equibank, a first priority secured party under the U.C.C., and American States, the Debtor's surety. It also involves the Debtor's attempt to reorganize. Equibank raises its complaint under § 506, a Complaint for Determination of Secured Status. American States complains for subrogation, exoneration and declaratory judgment as to the surety's priority. Both adversaries involve the same parties and identical issues and they were consolidated.

### HISTORY

RAM Construction Company, Inc., Debtor in Possession ("RAM"), is an earthmoving contractor under contract principally with various governmental units ("owners"). Pennsylvania municipal law requires those who contract with governmental entities to be bonded (8 Pa.S.A. § 193). American States is the surety that bonded all of RAM's contracts. RAM is indebted to Equibank for more than $1,120,000.00 and has given Equibank a first lien security interest in its accounts receivable and contract rights.

At various times during 1982, RAM experienced cash flow problems and was in default of various obligations. American States, the surety, claims to have paid approximately $2,000,000 in such claims. In

December, 1982, American States became alarmed about the further deterioration in RAM's financial position and wrote to the owners, bond obligees, and demanded that no further payments be made to RAM. Shortly thereafter Equibank followed with Equibank's notice to the same owners and demanded the same receivables.

With its cash flow effectively stopped, on January 21, 1983 RAM filed a voluntary Chapter 11 petition and then promptly filed an Application to Use Cash Collateral, which was heard on January 24 and 25, 1983. Equibank objected to the use of its collateral, raising the issue of adequate protection.

American States objected to the use of cash collateral and also applied for the appointment of a Trustee, alleging that RAM was paying its officers-stockholders and their relatives excessive salaries and was using these progress payments-accounts receivables to pay for general overhead expenses not needed to complete the specific bonded contracts for which the progress payments were being made. American States asserted but did not pursue its right to displace RAM on these various jobs and to complete these contracts with other contractors.

American States also claimed that as surety their claim to the earned and unearned contract balance was superior to both the Trustee (Debtor in Possession) and to Equibank. The issue of whether the surety, American States, or Equibank has the superior rights surfaced at that early hearing on the use of cash collateral. It now continues as the prime issue in this instant adversary.

Under these circumstances, on January 25, 1983 the Court entered a Preliminary Order (Docket item # 15), which was fashioned to provide both American States and Equibank adequate protection by limiting RAM payments to those expenses required to keep the bonded contracts ongoing.

American States was permitted to control RAM's payments of these expenditures to assure that the owners' monies received was dedicated to the ongoing expenses of an owner's contract.

Additionally, the Debtor was ordered to provide an accounting for each contract, so that income and expenses could be reviewed by Equibank and others. The Debtor was not permitted to use these monies to pay for equipment and other expenses not necessary on the ongoing contracts.

Also, salary payments to the Debtor's stockholders-officers and their relatives was limited by this Order and a following Order.

This Order was entered for several reasons. The Court believed that the surety would not be adequately protected if the Debtor was free to pay money received from the owners for Debtor expenses on other contracts, etc. Additionally, if the Court did not fashion such protection, the Court believed the surety would request a lifting of the stay and put another contractor on the job and claim the balances owed by the owner to the Debtor. Under the facts represented, the Court believed the surety would succeed and RAM's Chapter 11 would have a short life.

Equibank argued that it was also not adequately protected. At that time, it was not clear to the Court what monies would be available to Equibank after subcontractors were paid for ongoing work. It is clear Equibank would have a first priority claim in those funds not needed to complete these jobs. One owner was present, the City of Pittsburgh. The City indicated that it had no intention of paying its money to the bank before the jobs were completed. The City demanded assurances from RAM and American and demanded proof of insurance before it would tender its check.

The parties agreed that a small amount of accounts receivable was available to the Debtor and not attributable to ongoing bonded contracts. As to those monies, the lien of Equibank as first priority was not challenged.

In most respects, the instant consolidated adversaries are a formal replay of the earlier application for use of cash collateral. Both parties have submitted careful and competent briefs and the dispute has narrowed somewhat.

Equibank agrees that if American States formally declared RAM to be in default, and if American States went into performance, American States could claim priority in the unpaid progress payments. Equibank believes that because a formal default has not occurred, Equibank has superior rights as to the ongoing progress payments over the subcontractors who are being paid and over American States who is controlling the payments along with RAM. The Court believes that this is a theoretical argument that does not apply to the factual circumstances before this Court.

The owners will not make payments to RAM, unless the owners are assured that RAM will continue. If either Equibank or American States succeeds to these monies, the Debtor cannot continue. (Their demand letters on the owners are proof of those acts.) Without these monies, the Debtor could not provide the assurances which the owners require before these payments are made. The owners could easily require the surety to perform and the surety would then claim the contract payments directly.

Whether a formal default has been declared is arguing about angels on the head of a pin. In *Royal Indemnity Co. v. United States,* 371 F.2d 462, 178 Ct.Cl. 46 (1967), in a dispute between the contractor's assignee bank and the surety, the Court faced a similar problem and stated:

> All that is necessary for the surety to prevail is that the contractor be in default as a matter of fact; or that as a result of such default, the surety has become obligated to pay under its ... payment or performance bond. No formal declaration of default is required. 371 F.2d at 464.

Here, RAM is in fact in default of its bond with its surety and with its subcontractors, et al. RAM cannot proceed without the assistance of American States. Equibank does not dispute this fact. Neither Equibank or American States believes RAM has enough cash to make independent payments.

Under these facts and circumstances, Equibank's claim to these payments is not superior to the claim of the subcontractors or to the surety or to the owners. Equibank's claim rests solely on formalities which cannot occur. Equibank believes that until a formal default has occurred, these progress payments must be paid by the owner to RAM and Equibank's lien would attach to them and be superior to subcontractors, et al. The Court disagrees.

RAM could not transfer to Equibank rights in these payments, which are greater than RAM possesses. See *Prairie State Bank v. United States,* 164 U.S. 227 at 240, 17 S.Ct. 142 at 147, 41 L.Ed. 412 (1896). RAM's claim to these monies is encumbered first by the owners, then by its unpaid subcontractor, et al., and if unpaid, by its surety. By express contract with the surety and with the owner, RAM is subordinated first to the owner's claim, second to the subcontractors, et al. and then to the surety. Judge Marsh in *Atlantic Refining Co. v. Continental Cas. Co.,* 183 F.Supp. 478 (W.D.Pa.1960) recognized the trust nature of these funds until the job is complete and these parties paid. The Supreme Court in *Martin v. National Surety Co.,* 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822 (1937), read into the contract the bond and considered a default under the bond as a default under the contract and imposed an equitable trust upon the funds over the contractor's assignee.

The leading cases on the rights of sureties as cited by Equibank, when examined in light of our finding of default by RAM, raise no obstacles to our present holding. In *Perlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), the issue before the Supreme Court was whether a surety which had paid claims on a construction contract could be reimbursed out of the retainage being held by the owner over the claim of the trustee in bankruptcy. The Court held that the surety, having paid the laborers and materialmen, was entitled to the benefit of any subrogation rights necessary to reimburse it. The Court gave the surety priority over the trustee under the theory that the surety had an equitable lien pursuant to its equitable right of subrogation.

The Pennsylvania law also provides the surety the protection of equitable subrogation. *United States v. Commonwealth of Pennsylvania,* 349 F.Supp. 1370 (1972); *Jacobs v. Northeastern Corp.,* 416 Pa. 417, 206 A.2d 49 (1965).

In *Jacobs* a receiver for an insolvent contractor disputed the surety's claim to contract balances in the hands of the Commonwealth. The Court permitted the surety to recover the retainage based upon the doctrine of equitable subrogation. In determining the inapplicability of the Uniform Commercial Code, the Court observed:

> As a legal and practical matter, no creditor could or did advance credit on the basis of the funds withheld by the Commonwealth for payment to labor and materialmen. Furthermore, creditors are bound to know of the substantive law requiring the filing of bonds and the possible claims of sureties in the event of defaults by contractors. (citation omitted) 206 A.2d at 55.

We believe the reasoning to be equally as applicable to progress payments.

In reviewing the Supreme Court Decisions concerning the doctrine of equitable subrogation, the *Jacobs* Court quotes from *Perlman.* We find the language pertinent to the facts before us:

> The right of subrogation is not founded upon contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties. *Jacobs v. Northeastern Corp.,* supra, 206 A.2d at 53 *citing, Perlman v. Reliance Ins.,* supra.

Under the present circumstances, the Court believes that RAM is acting as a contractor for American States in order to complete these contracts. The surety conducts an interesting dance to avoid this explicit statement. The Court has no inhibitions about stating it explicitly. The Court believes that this arrangement permits the Debtor to operate and to complete these contracts at a lower cost than the introduction of a new contractor. If that is not the case, American States would or could easily replace RAM, in order to reduce their losses.

It is incumbent upon this Court to recognize that equity does not depend on mere formalities. To require the surety to pay the subcontractor, et al. first, so that the owners will then be required to pay the surety when under these circumstances all the parties agree that such an event would occur, is to raise formalities over substance and to defeat the Debtor's attempted reorganization and to defeat the Court's view of equity.

Discovery is to continue in a prompt, cooperative manner. Equibank is to receive or to be free to inspect the books of RAM, so that the accounting of income and expenses by contract is available to Equibank and others.

After Equibank has this information, if it appears that owner payments were made available to the Debtor after the filing of the case, to which post filing expenses of a class protected by the surety bond did not have a first claim, the Court will hear again Equibank's priority in those funds.