**AETNA CASUALTY AND SURETY COMPANY, a corporation, Plaintiff,**

v.

**J. F. BRUNKEN & SON, INC., a corporation, et al., Defendants.**

Civ. 72–4036.

United States District Court,
D. South Dakota, S. D.

April 23, 1973.

John L. Morgan and John F. Cogley, Morgan & Fuller, Mitchell, S. D., appeared in behalf of plaintiff.

Keith B. Anderson and Reed Hutchinson, Anderson & Hutchinson, Huron, S. D., appeared in behalf of defendant, National Bank of South Dakota.

John B. Wehde, Benson, Beach, Fingerson & Wehde, Huron, S. D., appeared in behalf of defendant Northwestern National Bank of Sioux Falls.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This is a declaratory judgment action, 28 U.S.C. Secs. 2201 and 2202, brought by a surety, Aetna Casualty and Surety Company (Aetna), to determine priorities between conflicting claimants to the property of J. F. Brunken & Son, Inc. (Brunken), or the proceeds thereof, now in the possession of the court-appointed receiver. In addition to the Brunken Corporation, those defendants remaining in the suit at the time of trial were the National Bank of South Dakota (NBSD) and Northwestern National Bank (NWB), both asserting security interests in the Brunken proceeds pursuant to the secured transaction provisions of the South Dakota Uniform Commercial Code, SDCL Chapters 57–35 to 57–39, as amended.

Defendant Brunken contracted for eight different construction projects which required performance bonds. Aetna furnished the requisite bonds pursuant to Brunken's separate applications dating from July, 1967, to March, 1970. Under the terms of the applications for the bonds, Brunken assigned, transferred and conveyed to Aetna

all rights, title and interest in and to all tools, plant, equipment and materials of every nature and description that the said (Brunken) may now or hereafter have upon said work, or in or about the site thereof, or used in connection with the work and located elsewhere, . . . .

Subsequently, Aetna was called upon and did perform in compliance with the bond's provisions on these four projects: Butte-Meade—bond application date: August 1, 1968. Hayward Sanitary Sewer District—bond application date: October 17, 1968.

Town of Toronto—bond application date: July 11, 1969. City of Rapid City —bond application date: August 4, 1969. As of December 19, 1972, the surety had expended $404,759.30 in performance of its contracts and had received $102,392.85, leaving a deficit of $302,366.45.

The evidence shows that the defendant NBSD had established a line of credit with Brunken since 1955, and over the years financed equipment purchases of the Brunken Corporation. On January 25, 1968, Brunken entered into a security agreement with NBSD. The security agreement listed specific pieces of property as collateral, and, also, contained an "after-acquired" clause [1] providing

---

1. The after-acquired clause of NBSD's security agreement provides that it shall have a security interest in certain described property

together with all repairs, improvements and accessions thereto and substitutions and replacements therefor at any time hereinafter made or acquired and all other Equipment (as that term is defined in the Uniform Commercial Code)

hereafter at any time acquired by Borrower or in which Borrower obtains rights;

All property of every kind and description in which the Borrower has or may acquire any interest now or hereafter at any time in the possession or control of the Bank for any reason including, without limitation, property delivered to the Bank as collateral, for

**292**

NBSD with a security interest in all other equipment subsequently acquired by Brunken. A financing statement was filed with the South Dakota Secretary of State on February 2, 1968, to perfect NBSD's security interest in the designated collateral. The financing statement and security agreement were identical except that the financing statement lacked the after-acquired clause present in the security agreement. The filed financing statement includes the attached list of equipment specified in the security agreement as collateral, and only that portion of the security agreement's after-acquired phrase which provides: "together with all repairs, improvements and accessions thereto and substitutions and replacements therefor at any time hereinafter made or acquired and all other".

In reliance upon the security agreement and financing statement, NBSD extended additional loans to the Brunken Corporation, which are now evidenced by five promissory notes signed by a corporate officer. As of May 26, 1972, the amount due and owing NBSD on these notes, according to its stipulated figures, is $180,933.99. Additional expenses were incurred by NBSD when Brunken defaulted upon all of its secured obligations in July, 1971, and NBSD "called in" its loans to Brunken. In the latter part of December, 1971, NBSD demanded possession of the collateral and proceeded to prepare the equipment for disposition. It was during this repair process that the Receiver demanded and obtained these assets for sale. According to NBSD's Exhibit 6, the conceded and contested amounts for preparing the collateral for auction totals $27,236.67.

Defendant NWB's interest in this litigation arises from its loans to Brunken which were sought to be protected by an April 7, 1970, financing statement filed with the Secretary of State. NWB concedes that the individual demands made by the three parties exceeds the fund now in the possession of the Receiver which totals $142,149.02.

With this factual background, which will be more fully developed herein, the two major issues can be stated. First, whether or not an unsecured surety, who is called upon to perform, acquires priority in the defaulting contractor's personal property over secured creditors whose security interests have been perfected in compliance with the South Dakota Uniform Commercial Code provisions. Secondly, if the banks as secured creditors prevail, what are their respective priorities in the fund now held by the Receiver?

Aetna relies upon two alternative theories to support its position that no Uniform Commercial Code (UCC) filing was required for it to prevail over the secured interests of the two banks. First, it contends that by performance of its suretyship obligations for and on behalf of Brunken, an equitable lien arises in favor of Aetna, which lien relates back to the inception of the suretyship agreement (the bond application date) for the purposes of determining priorities. In the alternative, should Aetna's claim be found to be a security interest, it must be considered to be the assignment of a contract right to an assignee who is also to do the performance under the contract, and, as such, it is expressly excluded from the secured transaction provisions of the UCC. *See* SDCL 57–35–14 (1967) (UCC Sec. 9–104(f)).

The seeds of invention which propagated Aetna's first theory were sown by court decisions recognizing the great weight of authority to the effect that a surety company is entitled to be subrogated to the rights of the contractor in the proceeds of the contract as against one asserting a claim for money loaned or advanced to the building contractor. "This is true even where there is an as-

safekeeping, or for collection or exchange for other property, and all dividends and distributions on or other rights in con-

nection with such property; and
All Proceeds of all of the foregoing.

signment of the right to collect the funds by the contractor to the bank or other lending institution." National Surety Corporation v. State Bank of Frankfort, 454 S.W.2d 354, 356 (Ky. 1970); *see also* In re J. V. Gleason, 452 F.2d 1219 (8th Cir. 1971) and cases cited therein.

It is Aetna's contention that its claim to the proceeds of the sale of the Brunken equipment is not a security interest within the meaning of the UCC as enacted in South Dakota. SDCL 57-1-10 (1967) (UCC Sec. 1-201(37)). The surety propounds a number of arguments in support of this contention, all of which have been previously used to establish a performing surety's superior claim, whether it be under an equitable lien or a subrogation theory, to retained funds due the defaulting contractor. J. White & R. Summers, Uniform Commercial Code Sec. 22-5 (1972); Comment, Surety vs. Lender: Priority of Claims to Contract Funds, 10 Washburn L.J. 356 (1971); Comment, Equitable Subrogation—Too Hardy A Plant To Be Uprooted By Article 9 of the U.C.C.?, 1971 U.Pitt.L.Rev. 580. There is no reason, argues Aetna, for saying that an equitable lien arises and attaches in the case of contract proceeds, but not in a case involving personal property (construction equipment).

In summary of the plaintiff surety's position, Aetna is requesting this court to extend the established priority it has been provided by law in the defaulting contractor's retained proceeds to the same superior position in the defunct contractor's personal property. This preferred status in the contractor's personal property is to be bestowed upon the surety, Aetna maintains, solely because of an equitable lien, as opposed to a subrogation right, and without regard to other secured creditors' interests in that personal property. I am unpersuaded by this argument, and Aetna's failure to discover any precedential authority to buttress its theory reveals its novel approach. The practical consequence of Aetna's theory is nothing less than an appropriation of a secured creditor's collateral to reimburse the performing surety, a judicial act in contravention of South Dakota law. SDCL 56-2-14 (1967).

█ The cases providing Aetna with the foundation from which it launches its arguments are readily distinguishable from the circumstances presented by the immediate suit. Those cases deal with the retained proceeds of a defaulting contractor where the surety fulfills his obligations under payment or performance bonds, and the surety then asserts an interest in those retained funds under the equitable doctrine of subrogation.

The equitable doctrine of subrogation is grounded in the principle that, when one, not a volunteer, pursuant to an obligation, fulfills the duties of another, he is entitled to assert the rights of that other against a third party. By paying the contractor's debts, the surety acquires the right of substitution to the position of the contractor's creditors when he pays. The doctrine does not arise from any specific contractual provision but is an assignment created by operation of law to prevent unjust enrichment.

U.Pitt.L.Rev., *supra*, at 583.

It is this subrogation principle that entitles the surety to assume the position of those parties he has made whole. When, on default of the contractor, the surety pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor, laborers, and materialmen insofar as there are receivables due them. National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843, 845 (1st Cir. 1969). Thus the surety accedes to these retained funds to preclude unjust enrichment.

██ However, as a general rule a surety cannot retain security as against prior attaching creditors. 72 C.J.S. Principal and Surety § 318 (1951). While the equitable lien theory that Aetna relies upon has been held to have survived the enactment of the UCC, Warren

Tool Co. v. Stephenson, 11 Mich.App. 274, 161 N.W.2d 133 (1968), it has been held more recently that the doctrine of equitable mortgages is no longer necessary or useful in commercial transactions since Article Nine reduces formal requisites to a minimum. Shelton v. Erwin, 472 F.2d 1118 (8th Cir. 1973). An equitable lien is recognized as an equitable remedy and the doctrines and maxims which form the foundation of equity jurisprudence are applicable. 51 Am. Jur.2d Liens Sec. 24 (1970). Thus the considerations of unjust enrichment and unconscionable retention of property come to bear. Upon the facts now before this court I find that Aetna is not entitled to an equitable lien upon the proceeds from the sale of the Brunken personal property. The defendant banks have not been unjustly enriched by acting upon their secured interests and foreclosing upon the secured construction equipment. Indeed, according to the banks' figures neither can be made whole from the equipment's proceeds.

The interest Aetna seeks to enforce in Brunken's personal property is by definition a "security interest", SDCL 57-1-10 (1967), and therefore falls within the filing provisions of Article Nine. SDCL 57-35-3 (1967) (UCC Sec. 9-102). The failure to file and perfect its interests is fatal to Aetna's claim in the fund now under litigation.

Aetna's alternate theory, that Article Nine filing requirements need not be met because of the specific exclusion provided in Sec. 9-104(f), is not applicable to the circumstances of the assets now sought by Aetna. SDCL 57-35-14 (1967) (UCC Sec. 9-104(f)) provides:

> Accounts, contract rights or chattel paper sold as part of business—Exclusion from provisions.—Chapters 57-35 to 57-39, inclusive, do not apply to a sale of accounts, contract rights or chattel paper as part of a sale of the business out of which they arose, or an assignment of accounts, contract rights or chattel paper which is for the purpose of collection only, or a transfer of a contract right to an as-

signee who is also to do the performance under the contract.

Aetna contends that the interest it has been assigned by Brunken, if found to be a security interest, is a contract right and excluded from the provisions of Chapter 57-35 to 57-39 as directed by the above statute.

■■ A contract right "means any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." SDCL 57-35-24 (1967) (UCC Sec. 9-106). The Brunken performance bond application did not convey a contract right to Aetna but an interest in personal property as collateral security to reimburse Aetna should it be called upon to perform. This is an interest that falls directly within the policy and scope of the secured transactions article of the UCC. SDCL 57-35-2 (1967) (UCC Sec. 9-102). Aetna's failure to comply with Article Nine's provisions is fatal to its alternate theory of obtaining the funds possessed by the receiver.

The remaining issue, relative to the order of priorities between the banks in the fund held by the Receiver, is resolved within Article Nine's provisions. Both banks obtained security agreements and filed financing statements in their financing arrangements with Brunken. Conflicting security interest in the same collateral are determined in compliance with SDCL 57-37-40 (1967) (UCC Sec. 9-312(5)(a)). Accordingly, since both interests were sought to be protected by filing, it is the order of filing that governs.

■ NWB challenges NBSD's priority claiming that the financing statement NBSD filed did not put them on notice as to the collateral NBSD claimed a security interest in. Because the NBSD filed financing statement specifically listed each item to be covered, NWB contends further inquiry was unnecessary, and NBSD's interest should be limited to those items listed in the financing statement. Thus, argues NWB, while NBSD's financing statement cov-

ered nearly all of Brunken's equipment when filed, at the time the Receiver took possession of Brunken's equipment NBSD's original listing covered only five items. Those five items, plus four additional items "relinquished" by it, contends NWB, are the only assets NBSD has a right to.

NWB's argument would have merit if it had, in fact, not known of the extensive security interest held by NBSD in Brunken's equipment. NWB was never misled by the alleged inadequacies of NBSD's financing statement. The evidence at trial revealed that although Loren Brunken had told NWB that NBSD had a lien on most all of his equipment, NWB neither asked for the financing statement filed with the South Dakota Secretary of State nor requested any further information from NBSD. Clearly, NWB never relied upon the NBSD financing statement and, therefore, it would seem inequitable to permit NWB to assert, at this point, any inadequacies in a financing statement it never bothered to examine, as a means of improving its priority in the funds in question. The main purpose of filing financing statements is to notify potential creditors of existing secured interests. R. Anderson, 4 Uniform Commercial Code Sec. 9–204:5 (2d ed. 1971). NWB had notice of an interest held by NBSD in the Brunken equipment. It chose to disregard the information it had and make loans without checking the proper filings. NWB was not prejudiced by any shortcomings of the NBSD financing statement and this court will not entertain this theory as a legitimate claim against NBSD's perfected security interests in the Brunken equipment, now in the form of proceeds in the hands of the Receiver.

Because NBSD perfected its security interest before NWB, and because the NBSD security agreement adequately provided for equipment Brunken acquired after the date of its signing, NBSD has a superior claim to the proceeds held by the Receiver. It is readily apparent that between its secured claims and the legitimate expenses incurred in preparing the equipment for auction, NBSD will deplete the proceeds. Therefore, it is unnecessary to further detail the remaining priorities in the litigated fund. The National Bank of South Dakota's claims will prevail.

This memorandum decision will constitute the findings of fact and conclusions of law of this court pursuant to Rule 52 of the ·Federal Rules of Civil Procedure.