524 A.2d 958

UNITED STATES FIDELITY AND GUARANTY COMPANY

v.

UNITED PENN BANK and Phoenix Industries.

Appeal of UNITED PENN BANK.

Superior Court of Pennsylvania.

Argued Oct. 22, 1986.

Filed April 24, 1987.

442

Arthur L. Piccone, Wilkes-Barre, for appellants.

Anthony J. Piazza, Jr., Scranton, for appellee.

Before WIEAND, CERCONE and HOFFMAN, JJ.

WIEAND, Judge:

The dispute in this case is between United States Fidelity & Guaranty Company (USF & G), a corporate surety which was called upon to make good a contractor's nonpayment of

the purchase prices for certain materials and supplies, and the United Penn Bank, a lending institution which held a perfected security interest in the same goods. After Phoenix Industries, Inc. (Phoenix), the contractor, had defaulted in the repayment of its loan to the bank, both the bank and USF & G asserted claims against the contractor's inventory. The trial court, in an interpleader proceeding, held that USF & G had a superior interest in the inventory and awarded to it the proceeds of a sale thereof. The bank appealed.

Between 1978 and 1980, United Penn Bank made various loans to Phoenix, a construction contractor. On July 28, 1981, the parties entered into a loan agreement which consolidated all outstanding loans and established a future line of credit. Pursuant to this agreement, Phoenix executed two promissory notes in favor of the bank: one for the amount of the consolidated indebtedness and the other to evidence an indebtedness for monies to be advanced pursuant to the new line of credit. As security, Phoenix gave the bank a security interest in all inventory and accounts of Phoenix, including future inventory and accounts thereafter acquired. The bank perfected its security interest by filing financing statements in Lackawanna County on July 30, 1981, and in the office of the Pennsylvania Secretary of State on September 1, 1981. In May, 1983, the bank renewed the line of credit which it had previously extended to Phoenix. Advances made by the bank pursuant to the new credit line were evidenced by a third promissory note which Phoenix executed and delivered to the bank on May 1, 1983.

Phoenix was thereafter awarded a contract to perform roofing and sheet metal work on a federal project to renovate the Chamberlain Munitions Plant in Scranton, Pennsylvania. Before Phoenix could begin work on the project, it was required, under federal law,[1] to obtain performance and payment bonds. To satisfy this requirement, Phoenix made application to USF & G, which, on October 24, 1983, issued

1. See: Miller Act, 40 U.S.C. § 270a.

the performance and payment bonds which enabled Phoenix to begin work on the Chamberlain project.

Phoenix thereafter ordered materials which were necessary for performance of the Chamberlain job. On October 26, 1983, Phoenix ordered insulation from Apache Building Products Company (Apache), which Apache delivered to Phoenix's plant on March 16, 1984. Phoenix also ordered and received roofing supplies from GAF Roofing Materials Company (GAF). Because of growing financial difficulties, Phoenix was unable to pay for the materials delivered by Apache and GAF.[2] Consequently, a demand for payment was made by Apache and GAF to USF & G in accordance with the terms of the payment bond which USF & G had issued on behalf of Phoenix.

On March 31, 1984, Phoenix defaulted on one of the promissory notes which it had executed in favor of the bank. Consequently, all promissory notes became immediately due and payable. On April 3, 1984, the bank confessed judgment against the subcontractor on one of the 1981 notes and caused the Sheriff of Lackawanna County to levy upon various items of personal property held by the subcontractor, including the materials which had been supplied by Apache and GAF for use on the Chamberlain project. These goods were scheduled for sheriff's sale on May 4, 1984.

On the day prior to the sheriff's sale, USF & G filed a sheriff's interpleader claim in which it objected to the sale of insulation and roofing materials delivered by Apache and GAF. With respect thereto, USF & G contended that Apache and GAF had acquired a "secured ownership interest" in the material which each had delivered to Phoenix. The claim was later amended by USF & G to assert its own security interest in the inventory by virtue of the surety bonds which it had issued to Phoenix for the Chamberlain project. The bank contested USF & G's claim but agreed that the disputed goods should be excluded from the sher-

2. Phoenix eventually filed a petition in bankruptcy.

iff's sale pending determination of the sheriff's interpleader action.

After hearing, the Lackawanna County Sheriff determined that although USF & G possessed a superior ownership interest in the insulation which had been sold to Phoenix by Apache, the bank's interest in the roofing material supplied by GAF had priority. Both the bank and USF & G filed exceptions to the sheriff's decision, and an appeal was subsequently filed by the parties in the Court of Common Pleas of Lackawanna County. Thereafter, the bank and USF & G entered into an escrow agreement pursuant to which the disputed property was sold, with the proceeds being deposited in an interest bearing escrow account at First State Bank in Scranton, Pennsylvania, to await decision of the pending litigation.

Following trial without jury, the court found that USF & G's interest in the inventory was superior to the security interest held by the bank, and the proceeds from the sale of the inventory were awarded to USF & G. Exceptions were filed and dismissed. In doing so, the trial court expressly relied upon a decision of this Court in *Himes v. Cameron County Construction Co.*, 289 Pa.Super. 143, 432 A.2d 1092 (1981), *aff'd*, 497 Pa. 637, 444 A.2d 98 (1982) and upon the decision of the Pennsylvania Supreme Court in *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965).

■ Article Nine of the Uniform Commercial Code, 13 Pa.C.S.A. § 9101 et seq., establishes a comprehensive scheme for the regulation of security interests in personal property and fixtures. See: 13 Pa.C.S.A. § 9101 comment–1972. Pursuant to 13 Pa.C.S.A. § 9201, a security agreement is effective not only between debtor and creditor, but also against subsequent purchasers of the secured collateral and against other creditors. Thus, a creditor with a perfected security interest in collateral has, under the Code, an interest therein which is superior to that of unsecured creditors. See: 79 C.J.S. *Secured Transactions* § 58. Generally, an unsecured surety "cannot retain security as against [a] prior attaching creditor[ ]." *Aetna Casualty &*

*Surety Co. v. Brunken & Son, Inc.,* 357 F.Supp. 290, 293 (D.S.D.1973). See: 72 C.J.S. *Principal and Surety* § 241.

In *Himes v. Cameron County Construction Corp., supra,* a general contractor had been awarded a contract by a municipal authority to construct sewer systems and perform related construction work. Before commencing work, the contractor obtained payment bonds from a surety as required by law. To finance the construction, the contractor borrowed money from a bank and, as collateral for the loan, granted to the bank a security interest in the proceeds of the construction contract. After construction was complete, the contractor experienced financial troubles and defaulted in repaying the bank loan. Financial difficulties also prevented the contractor from paying subcontractors who had performed work on the project. Unable to receive payment from the surety, which had become insolvent, one of the subcontractors commenced an action directly against the contractor to recover for labor and materials which the subcontractor had supplied to the project. After the subcontractor obtained a judgment against the contractor, he attempted to enforce the same by attaching funds which the municipal authority had withheld from the contract price as retainage. At or about the same time, the bank filed a claim with the authority in which it asserted a security interest in the retained contract funds and requested payment therefrom of the unpaid balance of its loan to the contractor. To resolve these conflicting claims, the authority commenced an interpleader action in the Court of Common Pleas of Cambria County and joined all known creditors of the contractor, including other subcontractors who had not been paid for work performed on the sewer project. After hearing, the trial court ordered that the subcontractors, rather than the bank, should receive the funds retained by the authority on the project. The Superior Court affirmed. In so doing, our Court observed that although the bank had been granted a security interest in the contract proceeds, its interest had never been perfected by attachment of the fund. In order for the bank's security interest to attach, the Court observed, it was necessary for

the contractor to acquire rights in the proceeds of the contract. *Id.*, 289 Pa.Superior Ct. at 149–150, 432 A.2d at 1096. Under the terms of its contract, however, the contractor was not entitled to receive the proceeds until it had paid all suppliers who had performed work on the project. Because the contractor failed to satisfy this contractual obligation, the Court held, he was not entitled to the retained proceeds, and, therefore, the security interest of the bank did not attach. *Id.* As a result, the Court concluded, the bank had no interest in the retained proceeds upon which to base a claim. *Id.*, 289 Pa.Superior Ct. at 152, 432 A.2d at 1097. The Supreme Court of Pennsylvania agreed and affirmed. See: *Himes v. Cameron County Construction Corp., supra.*

The decision in *Himes* does not create an exception to the general rule of priority which favors a secured creditor over an unsecured surety. *Himes* resolved conflicting claims between unsecured *subcontractors* and an *unsecured* creditor of a defaulting general contractor. As between the unsecured subcontractors and the unsecured creditor, *Himes* held, the subcontractors had priority in and to retained contract proceeds. However, the *Himes* Court did not determine the rights of an unsecured *surety* vis a vis a *secured* creditor. Therefore, the *Himes* decision does not compel or even support the surety's claim of priority in the instant case.

The result in *Himes* was based, in part, upon an earlier decision of the Pennsylvania Supreme Court in *Jacobs v. Northeastern Corp., supra.* There, a general contractor had entered contracts with governmental authorities for the erection of a state building and for the construction of certain state roads. In accordance with state law, the contractor had obtained performance and payment bonds for both projects, the bonds for each project being issued by a different surety. The contractor defaulted in paying claims for labor and material supplied for both projects, and the sureties made payment in compliance with the bonds which they had issued. Each surety then petitioned the

court of common pleas to recover monies which the governmental authorities had withheld as retainage. A receiver appointed on behalf of the contractor challenged the petitions and counterclaimed for the retained funds. He contended that the sureties were entitled only to their pro rata shares as creditors, and not, as successors to the rights of the contractor, to the full retainage. The trial court granted the petitions and awarded all retained funds to the sureties. In affirming the award of the trial court, the Supreme Court observed that the right of the sureties to the retained funds rested upon the doctrine of equitable subrogation. *Id.*, 416 Pa. at 419, 206 A.2d at 50. Under that doctrine, " 'a surety who pays the debt of another is entitled to all of the rights of the person he paid to enforce his right to be reimbursed.' " *Id.*, 416 Pa. at 425–426, 206 A.2d at 53, quoting *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 136–137, 83 S.Ct. 232, 235, 9 L.Ed.2d 190, 193–194 (1962). The Court reasoned:

> Had the surety [sic] not paid the labor and materialmen, the funds held by the Commonwealth agencies would not have been available to the general creditors. Since the sureties stand in the places of those whose claims they have paid, ..., the funds must be paid to the sureties, just as the funds would have gone, in the absence of a bond, to the labor and materialmen rather than to the general creditors. See *Prairie State Nat. Bank of Chicago v. United States*, 164 U.S. 227, 229, 17 S.Ct. 142, 147, 41 L.Ed. 412 (1896), quoted in *Pearlman.*

*Id.*, 416 Pa. at 426–427, 206 A.2d at 54. This was so, the Court concluded, even though the sureties had failed to acquire perfected security interests in the contract proceeds under the Uniform Commercial Code. In rejecting the receiver's argument that, absent perfected security interests, the sureties' claim to the proceeds was subordinate to the claims of the contractor's general creditors, the Court stated:

> The contract balance withheld would never have become due and payable to [the contractor] (or its receiver or

creditors) as long as [the contractor] defaulted on its obligation to pay labor and materialmen. Payment of the retained balance became due and available only upon performance by the sureties of [the contractor's] obligations. It is clear that all labor and material claims must be fully discharged before there is entitlement to the full contract payment. In all respects, the result so far as [the contractor] and its creditors are concerned is precisely the same whether the sureties satisfy the unpaid laborers and materialmen, or whether the Commonwealth directly pays the claimants out of the retained funds. Surely, the creditors of [the contractor] are not adversely affected because the sureties were called upon to, and did, perform their undertaking to pay labor and material claims.

*Id.,* 416 Pa. at 428, 206 A.2d at 54 (emphasis in original).

Like *Himes, Jacobs* did not alter the priority which secured creditors enjoy over unsecured sureties in the property of a defaulting contractor. *Jacobs* involved the priority between an unsecured surety and the receiver of a defaulting contractor; it did not determine the rights of the surety as against a secured creditor of the contractor. Indeed, the *Jacobs* Court observed that "[a]s a legal and practical matter, no creditor [of the contractor] could or did advance credit on the basis of the funds withheld by the Commonwealth for payment to labor and materialmen." *Id.,* 416 Pa. at 428, 206 A.2d at 55.

Nevertheless, the trial court interpreted *Jacobs* as generally favoring sureties over the contractor's secured creditors. We reject this interpretation. At most, *Jacobs* can be construed as suggesting that where a surety has paid labor and materialmen on behalf of a defaulting contractor, the surety becomes equitably subrogated to all rights which the labor and materialmen held as creditors of the contractor, including the right to recover the unpaid contract balance. In such a situation, the *Jacobs* court indicated, the surety acquired an equitable interest in the unpaid contract bal-

ance which would supersede conflicting claims by the contractor's unsecured creditors.

 In the instant case, it does not appear that the doctrine of equitable subrogation is applicable. It can have no application unless and until the surety has paid the outstanding debts of its principal or sustained some loss by reason of its suretyship. See: *Bishoff v. Fehl*, 345 Pa. 539, 542, 29 A.2d 58, 60 (1942); *Etter v. Industrial Valley Bank and Trust Co.*, 356 Pa.Super. 502, 506, 515 A.2d 6, 8 (1986); 74 Am.Jur.2d *Suretyship* § 171. Here, the record does not disclose that USF & G has paid the claims of Apache and GAF for materials sold to Phoenix. The surety, in its brief, acknowledges only that these suppliers have demanded payment and that, because of the payment bond which it issued to Phoenix, it "would be" obligated to pay these claims. See: Brief of Appellee, USF & G, at 3. Unless and until USF & G pays the suppliers, it cannot be subrogated to the rights of the materialmen against the subcontractor.

However, our decision does not rest upon such nonpayment. Even if USF & G had paid for the materials supplied by Apache and GAF, it could only have been subrogated to the rights which the materialmen themselves had in and to the inventory of Phoenix. Apache and GAF were general, unsecured creditors. They had not reserved a security interest in the goods delivered to Phoenix, but had relied upon the credit of the subcontractor. Under the Uniform Commercial Code, their unsecured claims were subordinate to the perfected security interest of the bank.

The dictum in *Jacobs* which favored a subrogated surety does not require a contrary result in this case. Where a surety has undertaken the obligations of a defaulting contractor, the dictum in *Jacobs* suggests, the surety should be accorded priority in *unpaid contract proceeds*. It does not even imply that the surety be given priority in *personal property* of the defaulting contractor where such property is subject to another's perfected security interest. Such a rule of law would be ill-considered, for the equities which favor recovery by a surety from the proceeds payable under the principal's contract have no application to property in

which another has a perfected security interest. In the latter situation, the priority established by the Uniform Commercial Code is controlling.

The ratio decidendi of the federal decisions is both helpful and persuasive. In *Aetna Casualty & Surety Co. v. Brunken & Son, Inc., supra,* the issue before the United States District Court for the District of South Dakota was "whether or not an unsecured surety, who [had been] called upon to perform, acquire[d] priority in the defaulting contractor's personal property over secured creditors whose security interests ha[d] been perfected in compliance with the South Dakota Uniform Commercial Code provisions." *Id.* at 292. The unsecured surety requested the court to extend the priority which the surety enjoyed in retained proceeds under a construction contract to the contractor's equipment. The court rejected this request. The court concluded that "[t]he practical consequence of [the surety's] theory [was] nothing less than an appropriation of a secured creditor's collateral to reimburse the performing surety, a judicial act in contravention of South Dakota law." *Id.* at 293. The court reasoned:

The cases providing [the surety] with the foundation from which it launches its arguments are readily distinguishable from the circumstances presented by the immediate suit. Those cases deal with the retained proceeds of a defaulting contractor where the surety fulfills his obligations under payment or performance bonds, and the surety then asserts an interest in those retained funds under the equitable doctrine of subrogation.

The equitable doctrine of subrogation is grounded in the principle that, when one, not a volunteer, pursuant to an obligation, fulfills the duties of another, he is entitled to assert the rights of that other against a third party. By paying the contractor's debts, the surety acquires the right of substitution to the position of the contractor's creditors when he pays. The doctrine does not arise from any specific contractual provision but is an assignment created by operation of law to prevent unjust enrichment.

[Comment, *Equitable Subrogation-Too Hardy a Plant To Be Uprooted By Article 9 of the UCC?*, 32 Pitt.L. Rev. 580, 583 (1971)].

It is this subrogation principle that entitles the surety to assume the position of those parties he has made whole. When, on default of the contractor, the surety pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor, laborers, and materialmen insofar as there are receivables due them. *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843, 845 (1st Cir.1969). Thus the surety accedes to these retained funds to preclude unjust enrichment.

However, as a general rule a surety cannot retain security as against prior attaching creditors. 72 C.J.S. Principal and Surety § 318 (1951). While the equitable lien theory that [the surety] relies upon has been held to have survived the enactment of the UCC, *Warren Tool Co. v. Stephenson*, 11 Mich.App. 274, 161 N.W.2d 133 (1968), it has been held more recently that the doctrine of equitable mortgages is no longer necessary or useful in commercial transactions since Article Nine reduces formal requisites to a minimum. *Shelton v. Erwin*, 472 F.2d 1118 (8th Cir.1973). An equitable lien is recognized as an equitable remedy and the doctrines and maxims which form the foundation of equity jurisprudence are applicable. 51 Am.Jur.2d Liens Sec. 24 (1970). Thus the considerations of unjust enrichment and unconscionable retention of property come to bear. Upon the facts now before this Court I find that [the surety] is not entitled to an equitable lien upon the proceeds from the sale of the [contractor's] personal property. The [secured creditors] have not been unjustly enriched by acting upon their secured interests and foreclosing upon the secured construction equipment.

*Id.* at 293–294.

Similar reasoning was employed by the United States District Court for the Middle District of Georgia in *In re*

*Merits Equipment Co.,* 438 F.Supp. 295 (M.D.Ga.1977). In rejecting the surety's claim to the equipment of a bankrupt contractor, the court distinguished the claim before it from cases where sureties had been accorded priority in retained contract funds over secured creditors.

> The equitable rights of the surety in these cases is founded upon the common sense proposition that the contract retainage funds would never become available to any creditor unless the surety completed the project. Stated differently, the contract funds were never really in the possession of the contractor, either as an asset for his general creditors or as collateral for the secured creditor, because the payment of the funds is conditioned upon the completion of the construction project:
>
>> This is not an interest in or lien upon, property or funds in the possession or control of the bankrupt [contractor]. Until the obligation to the city [owner] was fulfilled the bankrupt had no claim upon the retained funds.
>
> *In re Bray,* 127 F.Supp. 627, 628 (D.Conn.1954).
>
> Thus, the surety who completes the project is given first chance at the contract funds even if other creditors of the bankrupt contractor have previously secured their interest in the funds. The consequence of this equitable lien or equitable subrogation doctrine is that an exception is created to the general rule that only those creditors who perfect a security interest by following the U.C.C. or by obtaining a lien judgment can prevail over the trustee in bankruptcy, who, as of the day of the filing of the petition, stands in the position of a judgment creditor.
>
> . . . .
>
> The basis of any priority must be the result of an equitable lien or right of subrogation. However, the rationale for according such a lien to the surety does not apply in the case of equipment. . . . [T]he equipment in question was fully in the possession of the bankrupt and ownership was not in any way conditioned upon contractual performance. Stated differently, the surety has

done nothing with respect to the bankrupt creditor's equipment which raises up in the surety an equity superior to that of later judgment creditors. The equitable lien protects the surety whose performance enables funds to become available, but in the case of equipment the surety is in no better position than any other unsecured creditor. The surety cannot accede to the general assets of the contractor absent some assignment of title or attachment through a perfected security interests. In conclusion, because no equities arise in favor of the surety with respect to the bankrupt contractor's equipment, the surety stands as general unsecured creditor who must defer to the [secured creditors]. *Aetna Casualty & Surety Co. v. J.F. Brunken & Sons, Inc.*, 357 F.Supp. 290 (D.S.Dakota 1973).

*Id.* at 297, 298.

 We hold, therefore, that where a creditor has obtained a perfected security interest in personal property owned by a defaulting contractor, the rights of the secured creditor in and to such personal property are superior to and have priority over a claim thereto asserted by an unsecured surety which has been compelled to pay claims made by materialmen against the contractor.[3] When the trial court concluded otherwise, it fell into error.

**3.** USF & G argues that the bank's security interest did not attach to materials supplied by GAF where the purchase order for these items had been signed not only by Phoenix but also by the general contractor. We reject this argument. According to the Uniform Commercial Code, the bank's security interest in Phoenix's inventory would attach as soon as Phoenix had acquired "rights in the collateral." See: 13 Pa.C.S.A. § 9203(a)(3). Although Phoenix did not ever pay for the materials, it had acquired rights in these goods when it obtained possession thereof. See: *In re Pinellas-Pasco Wholesale Tire Co.*, 36 B.R. 559 (Bankr.M.D.Fla.1983); *Galleon Industries, Inc. v. Lewyn Machinery Co.*, 50 Ala.App. 334, 279 So.2d 137 (1973); *First National Bank of Arizona v. Carbajal*, 132 Ariz. 263, 645 P.2d 778 (1982); *Babson Credit Plan, Inc. v. Cordele Production Credit Association*, 146 Ga.App. 266, 246 S.E.2d 354 (1974); *Thrift, Inc. v. A.D.E., Inc.*, 454 N.E.2d 878 (Ind.App.1983). Phoenix's rights in these materials were no less real merely because the general contractor may also have acquired rights therein.

USF & G also argues that the bank entered an agreement with USF & G to subordinate its security interest in Phoenix's inventory in favor of the surety, and that USF & G relied thereon when it issued performance and payment bonds to Phoenix. Under this theory, even if the bank's security interest would entitle it to priority in the property of Phoenix, that superior right would have been subordinated to the claim of USF & G.

■ Although this issue was the subject of written and oral evidence at the hearing before the trial court, the court did not address the same in its decision. Having determined—erroneously, we have held—that the rights of USF & G were superior to those of the bank, the trial court did not make findings pertinent to USF & G's contention that the bank had agreed to subordinate its rights in and to the inventory of its creditor. Therefore, it is necessary that we remand in order that the trial court may determine whether the bank agreed to subordinate its security interest in the inventory of its creditor to the claim of the surety which was called upon to satisfy claims of materialmen.[4]

Reversed and remanded for determination of unresolved issues. Jurisdiction is not retained.

**4.** USF & G has asserted one final issue. It contends that we should dismiss this appeal and affirm the award of the trial court in accordance with the escrow agreement entered into by the parties because the bank consented therein to abide by the trial court's distribution of the proceeds. This issue, however, was not raised by USF & G at any time before the trial court; and, therefore, it is not properly before this Court for review. See: *Commonwealth v. National Federation of the Blind,* 471 Pa. 529, 536, 370 A.2d 732, 736 (1977); *Keystone Building Corp. v. Lincoln Savings and Loan Corp.,* 468 Pa. 85, 91, 360 A.2d 191, 194 (1976); *Kovach v. General Telephone Co. of Pennsylvania,* 340 Pa.Super. 144, 149, 489 A.2d 883, 885 (1985).